APPEAL,CLOSED,LC–5

# U.S. District Court
## U.S. District Court for the Northern District of Oklahoma (Tulsa)
### CIVIL DOCKET FOR CASE #: <u>4:20–cv–00086–GKF–CDL</u>

| | |
|---|---|
| Robinson v. Harvanek | Date Filed: 03/02/2020 |
| Assigned to: Judge Gregory K Frizzell | Date Terminated: 03/17/2023 |
| Referred to: Magistrate Judge Christine D Little | Jury Demand: None |
| Case in other court:  Oklahoma Western, 5:20–cv–00097 | Nature of Suit: 530 Habeas Corpus (General) |
| Washington Cty Dist Ct, CF–13–00280 | Jurisdiction: Federal Question |
| OCCA, F–14–00201 | |
| OCCA, PC–19–00081 | |

Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

**Petitioner**

| | | |
|---|---|---|
| **Keith Earl Robinson** | represented by | **Keith Earl Robinson** |
| | | #479285 |
| | | LEXINGTON–LARC–260 |
| | | PO BOX 260 |
| | | LEXINGTON, OK 73051 |
| | | PRO SE |

V.

**Respondent**

| | | |
|---|---|---|
| **Jeorld Braggs** | represented by | **Tessa L Henry** |
| *TERMINATED: 12/17/2020* | | Attorney General of Oklahoma |
| | | 313 NE 21ST STREET |
| | | OKLAHOMA CITY, OK 73105 |
| | | 405–522–4394 |
| | | Fax: 405–522–4534 |
| | | Email: fhc.docket@oag.ok.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Respondent**

| | | |
|---|---|---|
| **Rick Whitten** | represented by | **Caroline Elizabeth Jane Hunt** |
| *TERMINATED: 02/04/2022* | | Office of the Attorney General (OKC 313) |
| | | 313 NE 21ST ST |
| | | OKLAHOMA CITY, OK 73105 |
| | | 405–522–4410 |
| | | Fax: 405–522–4534 |
| | | Email: fhc.docket@oag.ok.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Tessa L Henry** |
| | | (See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Kameron Harvanek**                         represented by   **Caroline Elizabeth Jane Hunt**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Tessa L Henry**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/03/2020 | 1 | | PETITION for Writ of Habeas Corpus filed by Keith Earl Robinson. (Attachments: # 1 Envelope)(em) [Transferred from Oklahoma Western on 3/2/2020.] (Entered: 02/04/2020) |
| 02/03/2020 | 2 | | MOTION for Leave to Proceed in forma pauperis by Keith Earl Robinson. (em) [Transferred from Oklahoma Western on 3/2/2020.] (Entered: 02/04/2020) |
| 02/03/2020 | 3 | | BRIEF IN SUPPORT re 1 Petition for Writ of Habeas Corpus by Keith Earl Robinson. (em) [Transferred from Oklahoma Western on 3/2/2020.] (Entered: 02/04/2020) |
| 02/03/2020 | 4 | | NO PREVIOUS Cases (em) [Transferred from Oklahoma Western on 3/2/2020.] (Entered: 02/04/2020) |
| 02/03/2020 | 5 | | ENTER ORDER REFERRING CASE to Magistrate Judge Suzanne Mitchell. Motions referred to Suzanne Mitchell.Entered at the direction of the Honorable Jodi W. Dishman on 02/03/2020. (em) [Transferred from Oklahoma Western on 3/2/2020.] (Entered: 02/04/2020) |
| 02/04/2020 | | | Notice of Mailing LCvR5.4/Change of Address form, Doc 1 , and Doc 5 to Keith Earl Robinson #479285 LEXINGTON–LARC–260 P O Box 260 Lexington, OK 73051 (em) [Transferred from Oklahoma Western on 3/2/2020.] (Entered: 02/04/2020) |
| 02/06/2020 | 6 | | REPORT AND RECOMMENDATION re 1 Petition for Writ of Habeas Corpus filed by Keith Earl Robinson. The undersigned recommends the transfer of this action to the United States District Court for the Northern District of Oklahoma for all further proceedings. Objections to R&R due by 2/27/2020. This Report and Recommendation disposes of all issues and terminates the referral to the Magistrate Judge. Signed by Magistrate Judge Suzanne Mitchell on 2/6/20. (lb) [Transferred from Oklahoma Western on 3/2/2020.] (Entered: 02/06/2020) |
| 03/02/2020 | 7 | | **ORDER ADOPTING REPORT AND RECOMMENDATION** for 6 Report and Recommendation, 2 Motion for Leave to Proceed in forma pauperis filed by Keith Earl Robinson...The Clerk of the Court is directed to transfer this matter to the United States District Court for the Northern District of Oklahoma |

| | | | |
|---|---|---|---|
| | | | for all further proceedings. Signed by Honorable Jodi W. Dishman on 03/02/2020. (nv) [Transferred from Oklahoma Western on 3/2/2020.] (Entered: 03/02/2020) |
| 03/02/2020 | 8 | | CASE TRANSFERRED IN from Oklahoma Western (Entered: 03/02/2020) Contains One or More Restricted PDFs |
| 03/02/2020 | 9 | | MINUTE ORDER by Court Clerk , changing case number to 20−CV−86−GKF−FHM  (This entry is the Official Order of the Court. No document is attached.) (sc, Dpty Clk) (Entered: 03/02/2020) |
| 03/06/2020 | 10 | | ORDER by Judge Gregory K Frizzell ; directing Respondent to show cause why the writ should not issue and file a response to the petition( Responses due by 4/6/2020, Replies due by 5/6/2020); setting/resetting Filing Fee deadline(s): ( Filing Fee due by 4/6/2020); denying 2 Motion for Leave to Proceed in Forma Pauperis (Re: 1 PETITION for Writ of Habeas Corpus ) (kjp, Dpty Clk) (Entered: 03/06/2020) |
| 03/06/2020 | | | ***Remark: Emailed docket numbers 1 and 3 to the Office of the Attorney General at fhc.docket@oag.ok.gov (Re: 10 Order,, Directing Respondent to Show Cause re: PWHC,, Setting/Resetting Filing Fee Deadline(s),, Ruling on Motion to Proceed in Forma Pauperis, ) (sc, Dpty Clk) (Entered: 03/06/2020) |
| 03/11/2020 | 11 | | ATTORNEY APPEARANCE by Tessa L Henry on behalf of Jeorld Braggs [Note: Attorney Tessa L Henry added to party Jeorld Braggs(pty:res).] (Henry, Tessa) (Entered: 03/11/2020) |
| 04/06/2020 | 12 | | MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 1 PETITION for Writ of Habeas Corpus ) by Jeorld Braggs (Henry, Tessa) (Entered: 04/06/2020) |
| 04/07/2020 | 13 | | ORDER by Judge Gregory K Frizzell ; setting/resetting deadline(s)/hearing(s): ( Responses due by 5/7/2020, Replies due by 6/7/2020); granting 12 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 1 PETITION for Writ of Habeas Corpus ) (kjp, Dpty Clk) (Entered: 04/07/2020) |
| 05/04/2020 | 14 | | ORDER by Judge Gregory K Frizzell , setting/resetting Filing Fee deadline(s): ( Filing Fee due by 5/15/2020) (Re: 1 PETITION for Writ of Habeas Corpus ) (kjp, Dpty Clk) (Entered: 05/04/2020) |
| 05/04/2020 | | | ***Remark: *mailed petitioner one blank motion to proceed in forma pauperis (form AO−240) identified as Case No. 20−CV−0086−GKF−FHM to: Keith Earl Robinson #479285 LEXINGTON−LARC−260 PO BOX 260 LEXINGTON, OK 73051* (sac, Dpty Clk) (Entered: 05/04/2020) |
| 05/06/2020 | 15 | | MOTION to Dismiss *Petition for Writ of Habeas Corpus As Time−Barred by the Statute of Limitations* by Jeorld Braggs (Henry, Tessa) (Entered: 05/06/2020) |
| 05/06/2020 | 16 | | BRIEF in Support of Motion (Re: 15 MOTION to Dismiss *Petition for Writ of Habeas Corpus As Time−Barred by the Statute of Limitations* ) by Jeorld Braggs ; (With attachments) (Henry, Tessa) (Entered: 05/06/2020) |
| 05/15/2020 | 17 | | RESPONSE in Opposition to Motion (Re: 15 MOTION to Dismiss *Petition for Writ of Habeas Corpus As Time−Barred by the Statute of Limitations* ) by Keith Earl Robinson ; (sc, Dpty Clk) (Entered: 05/15/2020) |

| 05/15/2020 | 18 | | MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 14 Order, Setting/Resetting Filing Fee Deadline(s), ) by Keith Earl Robinson (sc, Dpty Clk) (Entered: 05/15/2020) |
|---|---|---|---|
| 05/18/2020 | 19 | | ORDER by Judge Gregory K Frizzell ; setting/resetting Filing Fee deadline(s): ( Filing Fee due by 6/15/2020); granting 18 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (kjp, Dpty Clk) (Entered: 05/18/2020) |
| 05/21/2020 | 20 | | FILING FEES Paid in Full by Keith Earl Robinson (alg, Dpty Clk) (Entered: 05/21/2020) |
| 11/05/2020 | 21 | | MINUTE ORDER *by Court Clerk reassigning the magistrate judge in this case pursuant to General Order 20–37*, reassigning case to Magistrate Judge Christine D Little, Magistrate Judge Frank H McCarthy no longer assigned to case, changing case number to 20–cv–86–GKF–CDL  (This entry is the Official Order of the Court. No document is attached.) (a–hc, Dpty Clk) (Entered: 11/05/2020) |
| 12/17/2020 | 22 | | OPINION AND ORDER by Judge Gregory K Frizzell ; adding party Rick Whitten terminating party Jeorld Braggs ; denying 15 Motion to Dismiss (lah, Chambers) (Entered: 12/17/2020) |
| 01/15/2021 | 23 | | MOTION for Extension of Time to Respond to Motion (Re: 1 PETITION for Writ of Habeas Corpus ) by Rick Whitten (Henry, Tessa) (Entered: 01/15/2021) |
| 01/19/2021 | 24 | | ORDER by Judge Gregory K Frizzell ; granting 23 Motion for Extension of Time to Respond to Motion (Re: 1 PETITION for Writ of Habeas Corpus ) (lah, Chambers) (Entered: 01/19/2021) |
| 02/08/2021 | 25 | | ATTORNEY APPEARANCE by Caroline Elizabeth Jane Hunt on behalf of Rick Whitten [Note: Attorney Caroline Elizabeth Jane Hunt added to party Rick Whitten(pty:res).] (Hunt, Caroline) (Entered: 02/08/2021) |
| 02/08/2021 | 26 | | MOTION for Extension of Time to Respond to Motion (Re: 1 PETITION for Writ of Habeas Corpus ) by Rick Whitten (Henry, Tessa) (Entered: 02/08/2021) |
| 02/10/2021 | 27 | | ORDER by Judge Gregory K Frizzell *granting Second Motion for Extension of Time (Doc. 26)* ; setting/resetting deadline(s)/hearing(s): *Response due on or before 3/5/21; Reply due no later than 30 days from the response filing date.* ( Responses due by 3/5/2021); granting 26 Motion for Extension of Time to Respond to Motion (Re: 1 PETITION for Writ of Habeas Corpus ) (lah, Chambers) (Entered: 02/10/2021) |
| 03/05/2021 | 28 | | RESPONSE in Opposition to Motion (Re: 1 PETITION for Writ of Habeas Corpus ) by Rick Whitten ; (With attachments) (Hunt, Caroline) (Entered: 03/05/2021) |
| 03/05/2021 | 29 | | COPIES OF STATE COURT HABEAS TRANSCRIPT(S)/RECORD(S) by Rick Whitten (With attachments) (Hunt, Caroline) (Entered: 03/05/2021) Contains One or More Restricted PDFs |
| 03/24/2021 | 30 | | REPLY to Response to Motion (Re: 1 PETITION for Writ of Habeas Corpus ) by Keith Earl Robinson ; (sc, Dpty Clk) (Entered: 03/24/2021) |
| 03/24/2021 | 31 | | MOTION to Strike *(submitted as part of 30 )* (Re: 28 RESPONSE in Opposition to Motion) by Keith Earl Robinson (sc, Dpty Clk) Modified on |

| | | | |
|---|---|---|---|
| | | | 3/24/2021 to add link (sc, Dpty Clk). (Entered: 03/24/2021) |
| 04/14/2021 | 32 | | RESPONSE in Opposition to Motion (Re: 31 MOTION to Strike *(submitted as part of 30 )* ) by Rick Whitten ; (Hunt, Caroline) (Entered: 04/14/2021) |
| 06/30/2021 | 33 | | MOTION to Stay by Keith Earl Robinson (sc, Dpty Clk) (Entered: 06/30/2021) |
| 07/22/2021 | 34 | | RESPONSE in Opposition to Motion (Re: 33 MOTION to Stay ) by Rick Whitten ; (With attachments) (Hunt, Caroline) (Entered: 07/22/2021) |
| 02/04/2022 | 35 | | ORDER by Judge Gregory K Frizzell ; adding party Kameron Harvanek terminating party Rick Whitten ; denying 31 Motion to Strike; denying 33 Motion to Stay (lah, Chambers) (Entered: 02/04/2022) |
| 04/22/2022 | 36 | | MOTION to Amend (Re: 1 PETITION for Writ of Habeas Corpus ) by Keith Earl Robinson (sc, Dpty Clk) (Entered: 04/22/2022) |
| 05/13/2022 | 37 | | RESPONSE in Opposition to Motion *To Amend The Application For Habeas Relief* (Re: 36 MOTION to Amend ) by Kameron Harvanek ; (Hunt, Caroline) (Entered: 05/13/2022) |
| 03/17/2023 | 38 | | OPINION AND ORDER by Judge Gregory K Frizzell ; granting certificate of appealability; denying certificate of appealability; denying 36 Motion to Amend; denying 1 Petition for Writ of Habeas Corpus (2241/2254) (Re: 36 MOTION to Amend , 1 PETITION for Writ of Habeas Corpus ) (pll, Dpty Clk) (Entered: 03/17/2023) |
| 03/17/2023 | 39 | | JUDGMENT by Judge Gregory K Frizzell , entering judgment in favor of respondent against petitioner (terminates case) (pll, Dpty Clk) (Entered: 03/17/2023) |
| 03/17/2023 | | | ***Civil Case Terminated (see document number 39 ) (lmt, Dpty Clk) (Entered: 03/20/2023) |
| 04/03/2023 | 40 | | NOTICE OF APPEAL to Circuit Court (Re: 39 Judgment, Entering Judgment, 38 Opinion and Order,, Granting Certificate of Appealability,, Denying Certificate of Appealability,, Ruling on Motion to Amend,, Ruling on Petition for Writ of Habeas Corpus (2241/2254), ) by Keith Earl Robinson (mlb, Dpty Clk) (Entered: 04/03/2023) |
| 04/03/2023 | 41 | | ***Remark: *two duplicate copies of notice of appeal received; petitioner sent no envelope for return of file stamped copy* (Re: 40 Notice of Appeal to Circuit Court, ) (mlb, Dpty Clk) (Entered: 04/03/2023) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KEITH EARL ROBINSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 20-CV-0086-GKF-CDL |
| | ) | |
| KAMERON HARVANEK, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Petitioner Keith Earl Robinson, an Oklahoma prisoner appearing without counsel, petitions for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his custody under the criminal judgment entered against him in Washington County District Court Case No. CF-2013-280. Robinson claims his custody is unconstitutional because the State of Oklahoma failed to prove his guilt beyond a reasonable doubt, the trial court deprived him of due process by aiding the State in obtaining evidence to discredit a defense witness and by failing to properly instruct the jury, and his trial and appellate attorneys provided constitutionally ineffective assistance. Robinson seeks leave to amend the petition to add a due process claim alleging that the State lacked jurisdiction over his prosecution and to further fault appellate counsel for failing to raise this claim. Respondent Kameron Harvanek urges the Court to deny the motion to amend and the petition. Dkts. 28, 37. For the following reasons, the Court denies the motion to amend, denies the petition, and grants a certificate of appealability as to one claim.[1]

---

[1] The Court has considered Robinson's petition (Dkt. 1) and supporting brief (Dkt. 3), Harvanek's response in opposition to the petition (Dkt. 28) and attached exhibits, Robinson's reply brief (Dkt. 30), Robinson's motion for leave to amend (Dkt. 36), Harvanek's response in opposition to the motion (Dkt. 37), the record of state-court proceedings (Dkt. 29), some portions of the state-court record that are available to the public through the Oklahoma State Courts Network (oscn.net), and applicable law.

## I.     Procedural background[2]

In January 2014, a jury found Robinson guilty of first-degree burglary, after former conviction of two or more felonies, and recommended a 23-year prison sentence and a $500 fine. Dkt. 29-7, O.R., at 66-67.[3]  The trial court sentenced Robinson accordingly.  Dkt. 29-6, Tr. Sentencing Hr'g, at 4.  Represented by counsel, Robinson filed a direct appeal in the Oklahoma Court of Criminal Appeals ("OCCA"), raising six claims.  Dkt. 28-2, at 2-3.  The OCCA rejected each claim on the merits and affirmed Robinson's conviction and sentence.  Dkt. 28-1.

Proceeding without counsel, Robinson filed two applications for postconviction relief, in 2015 and 2021.[4]  In the 2015 application, Robinson identified two claims:  (1) "Insufficient Trial and Appellate Counsel," and (2) "witness testimony tampering/Prosecution misconduct."  Dkt. 28-4, at 3-4.  The state district court denied relief, and Robinson did not perfect a postconviction appeal.  Dkts. 28-7, 28-9, 28-13, 28-17; *see also* Dkt. 22, at 2-9.  In the 2021 application, Robinson relied on *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), to claim the State of Oklahoma lacked jurisdiction over his prosecution because he committed burglary within Indian country, specifically, within the Cherokee Nation Reservation, and his victims are Indian ("the *McGirt*

---

[2]  The Court develops the factual background relevant to Robinson's habeas claims in section III.B of this opinion.

[3]  For consistency, the Court's citations refer to the CM/ECF header pagination.

[4]  Between 2015 and 2021 Robinson filed additional applications for postconviction relief seeking leave to file an out-of-time postconviction appeal to challenge the order denying the 2015 application.  Robinson's unsuccessful efforts to appeal the denial of the 2015 application are set forth in more detail in this Court's prior opinion and order denying Harvanek's motion to dismiss the petition as barred by 28 U.S.C. § 2244(d)(1)'s one-year statute of limitations.  Dkt. 22, at 2-9.

claim").[5]  Dkt. 34-1, at 2-3, 15.  Relying on the OCCA's decision that *McGirt* does not apply

retroactively to convictions that were final before July 9, 2020,[6] the state district court denied the

2021 application.  *See* Order (Nov. 1, 2021), *State v. Robinson*, https://www.oscn.net/dockets/

GetCaseInformation.aspx?db=washington&number=CF-2013-00280&cmid=9604,  last  visited

Feb. 13, 2023.[7]  Robinson timely filed a postconviction appeal, and the OCCA affirmed the denial

of the 2021 application.  *See id.* (Mandate and Order filed April 11, 2022).

In the petition, Robinson seeks federal habeas relief on four claims he presented on direct

appeal and on the ineffective-assistance-of-appellate-counsel claim ("IAAC claim") he raised in

his 2015 application for postconviction relief.  Dkts. 1, 3.  Robinson also seeks leave to amend the

---

[5] In *McGirt*, the United States Supreme Court held that Congress never disestablished the Muscogee (Creek) Nation Reservation and the land within the historical boundaries of that reservation is Indian country as defined in 18 U.S.C. § 1151(a).  140 S. Ct. at 2459.  Under the Major Crimes Act ("MCA"), 18 U.S.C. § 1153(a), "[o]nly the federal government, not the State, may prosecute Indians for major crimes committed in Indian country."  140 S. Ct. at 2478.  One of the crimes enumerated in the MCA is burglary.  18 U.S.C. § 1153(a).  "But the MCA applies only to certain crimes committed in Indian country by Indian defendants."  *McGirt*, 140 S. Ct. at 2479.  The *McGirt* Court explained that "[a] neighboring statute," 18 U.S.C. § 1152 "provides that federal law applies to a broader range of crimes by or against Indians in Indian country" and that "[s]tates are otherwise free to apply their criminal laws in cases of non-Indian victims and defendants, including within Indian country."  *Id.*  The OCCA later recognized that the Cherokee Nation Reservation has not been disestablished and therefore is Indian country as defined in § 1151(a).  *Hogner v. State*, 500 P.3d 629, 634-35 (Okla. Crim. App. 2021).

[6] *See State ex rel. Matloff v. Wallace*, 497 P.3d 686, 689-94 (Okla. Crim. App. 2021), *cert. denied sub nom. Parish v. Oklahoma*, No. 21-467, 2022 WL 89297 (U.S. Jan. 10, 2022),

[7] Because neither party provided copies of the state court decisions related to the 2021 application, the Court takes judicial notice of the state-court record and documents linked thereto that are available to the public through the Oklahoma State Courts Network.  *See Johnson v. Spencer*, 950 F.3d 680, 705-06 (10th Cir. 2020) (discussing federal courts' discretion to take judicial notice of public records, including records of state court proceedings).

petition to add the *McGirt* claim and a claim that appellate counsel provided constitutionally ineffective assistance by failing to raise the *McGirt* claim. Dkt. 36, at 1, 5-15.

## II. Motion for leave to amend

Federal Rule of Civil Procedure 15 governs Robinson's request to amend the petition. 28 U.S.C. § 2242; *Mayle v. Felix*, 545 U.S. 644, 655-65 (2005). Because Harvanek filed a response to the petition and opposes amendment, Robinson may not amend without leave of Court. Fed. R. Civ. P. 15(a)(2). Under Rule 15(a)(2), a "court should freely give leave" to amend "when justice so requires." A court may, however, deny leave to amend if the proposed amendment would be futile. *Stafford v. Saffle*, 34 F.3d 1557, 1560 (10th Cir. 1994).

Harvanek contends, and the Court agrees, that amendment would be futile because both the *McGirt* claim and the claim that appellate counsel should have raised the *McGirt* claim are untimely, under 28 U.S.C. § 2244(d)(1)'s one-year statute of limitations, and do not relate back to Robinson's original claims. Dkt. 37, at 1-6; *see Felix*, 545 U.S. at 650 (explaining that "[a]n amended habeas petition . . . does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth"); *Postelle v. Carpenter*, 901 F.3d 1202, 1225 (10th Cir. 2018) (noting that because "federal habeas law strictly limits the circumstances under which an amendment can relate back to the original petition filing," a proposed amendment can relate back "'*if and only if* . . . the proposed amendment does not seek to add a new claim or to insert a new theory into the case.'" (emphasis in original) (quoting *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000))). This Court previously determined the *McGirt* claim is untimely under § 2244(d)(1)(A) and does not relate back to Robinson's original claims. *See* Dkt. 35, at 5-7. Robinson effectively asks this Court to reconsider that ruling and suggests the *McGirt* claim is timely under either § 2244(d)(1)(C) or

(d)(1)(D). Dkt. 36, at 2. But these provisions do not apply. *See Owens v. Whitten*, No. 22-5106, 2022 WL 17972141, at *1 (10th Cir. Dec. 28, 2022) (unpublished)[8] ("*McGirt*'s focus on a question of federal-versus-state jurisdiction does not alter the conclusion that the one-year limitations period set out in § 2244(d)(1)(A), rather than the ones set out in § 2244(D)(1)(C) and/or (D), applies to *McGirt*-based challenges to the validity of state convictions."). The Court therefore reaffirms its prior ruling that it would be futile to amend the petition to add the *McGirt* claim.[9]

Likewise, it would be futile to amend the petition to assert a new claim that appellate counsel should have raised the *McGirt* claim. Like the *McGirt* claim itself, this claim is untimely under § 2244(d)(1)(A). And no other provision of § 2244(d)(1) provides a later commencing one-year limitation period. *Owens*, 2022 WL 17972141, at *1. Further, this new claim does not relate back to the original IAAC claim. Robinson's original IAAC claim alleges that appellate counsel should have argued (1) that trial counsel was ineffective for failing to (a) challenge the reliability of the testifying victim's out-of-court identification of Robinson as tainted by Detective Nathan Mellen's alleged misconduct and (b) object to Detective Mellen's presence in the courtroom during that victim's testimony; and (2) that the prosecutor committed misconduct by (a) permitting

---

[8] Although *Owens* is unpublished, the Court finds the reasoning in *Owens*, and the reasoning in the decisions cited therein, persuasive. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A). The Court also cites all other unpublished decisions herein for their persuasive value.

[9] The *McGirt* claim also lacks merit. Robinson contends the federal government had exclusive jurisdiction to prosecute him, either under the MCA or the General Crimes Act ("GCA"), 18 U.S.C. § 1152, because he committed burglary in Indian Country and his victims are Indian. Dkt. 36, at 2-3, 5-6; Dkt. 34-1, at 2. But the MCA applies to "[a]ny Indian" who commits burglary in Indian Country. 18 U.S.C. § 1153(a). And Robinson alleges the victims are Indian, not that he is. "So even assuming that the text of the Major Crimes Act provides for exclusive federal jurisdiction over major crimes committed by Indians in Indian country," *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022), the MCA does not apply to Robinson. And, to the extent Robinson asserts that the GCA barred the State from exercising criminal jurisdiction over his prosecution, he is mistaken because the *Castro-Huerta* Court held that "the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian Country." 142 S. Ct. at 2504-05.

Detective Mellen to tamper with the victim's out-of-court identification by showing her a photo lineup with names on it before she identified Robinson on a photo lineup without names and (b) by permitting Detective Mellen to "perjur[e] himself on the stand by testifying that he never showed [the victim] the [photo] lineup with names on it." Dkt. 1, at 7; Dkt. 3, at 32-36. Robinson's new claim alleges that appellate counsel should have researched "laws that had been in place for over 100 years" to determine the continued existence of the Cherokee Nation Reservation and should have argued that the State lacked jurisdiction to prosecute Robinson, a non-Indian, for a crime he committed against Indian victims in Indian country. Dkt. 36, at 5-15. This new claim does not relate back to the original IAAC claim because it relies on different "operative facts" and impermissibly attempts to assert a new theory regarding appellate counsel's allegedly deficient representation. *Felix*, 545 U.S. at 659; *Espinoza-Saenz*, 235 F.3d at 505. Thus, it would be futile to amend the petition to add the new claim regarding appellate counsel's alleged ineffectiveness.

For these reasons, the Court denies the motion for leave to amend.

## III.    Petition for writ of habeas corpus

Robinson claims he was deprived of his Fourteenth Amendment right to due process when the State of Oklahoma failed to prove every essential element necessary to convict him of first-degree burglary (claim one); when the trial judge assumed the role of a prosecutor by investigating a defense witness, Tammie Lea Chidester, and providing evidence to the prosecutor that the prosecutor used to discredit her testimony (claim two); and when the trial court did not, *sua sponte*, instruct the jury on the lesser included offense of breaking and entering without permission (claim three). Dkt. 3, at 12-25. Robinson further claims he was deprived of his Sixth Amendment right to the effective assistance of trial counsel when trial counsel (1) demonstrated "general ineptitude" during his examination of several witnesses; (2) failed to object to the trial court's participation in

6

investigating and impeaching Ms. Chidester and failed to adequately investigate and interview Ms. Chidester and to prepare other defense witnesses for trial; and (3) failed to request jury instructions on the defense of alibi and on the lesser included offense of breaking and entering without permission (claim four).  Dkt. 3, at 26-32.  Finally, Robinson claims he was deprived of his Sixth Amendment right to the effective assistance of appellate counsel because appellate counsel should have argued on direct appeal (1) that trial counsel was ineffective for failing to challenge the reliability of the testifying victim's out-of-court identification of Robinson as tainted by Detective Mellen's alleged misconduct and object to Detective Mellen's presence in the courtroom during that victim's testimony, and (2) that the prosecutor committed misconduct by permitting Detective Mellen to tamper with the victim's out-of-court identification by showing her a photo lineup with names on it before she identified Robinson on a photo lineup without names and by permitting Detective Mellen to "perjure[] himself on the stand by testifying that he never showed [the victim] the [photo] lineup with names on it."  Dkt. 3, at 32-37.

Before evaluating these claims, the Court first discusses the limits on habeas review and provides factual context for Robinson's claims.

### A.    Limits on federal habeas review

A federal district court has discretion to grant federal habeas relief to a state prisoner "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and the Supreme Court's habeas jurisprudence, strictly limit this discretion.  Two limits are relevant in this case.

### 1. Claims adjudicated on the merits in state court

First, as to any federal claim that the OCCA adjudicated on the merits, this Court may not grant relief unless Robinson first shows that the OCCA's decision as to that claim either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

Under § 2254(d)(1), the first question for the habeas court is whether the petitioner's claim rests on law that was clearly established by Supreme Court precedent at the time of the relevant state-court decision. *House v. Hatch*, 527 F.3d 1010, 1015-18 (10th Cir. 2008). A state court's decision is "contrary to" Supreme Court precedent only if the state court "applie[d] a rule that contradicts that precedent or the state court "confront[ed] a set of facts that are materially indistinguishable from" the facts in controlling Supreme Court precedent and reached a different result than that precedent. *Id.* at 1018. A state court's decision unreasonably applies Supreme Court precedent when it identifies the correct controlling precedent but applies that precedent to the facts of the case in an "objectively unreasonable" manner. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see also House*, 527 F.3d at 1019 (explaining that "the Supreme Court has concluded that although [the objectively unreasonable] standard does not require all reasonable jurists to agree that the state court was unreasonable, an unreasonable application constitutes more than an incorrect application of federal law").

Under § 2254(d)(2), "'[a] state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'" *Wood v.*

8

*Carpenter*, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting *Byrd v. Workman*, 645 F.3d 1159, 1170-72 (10th Cir. 2011)). But "a state-court factual determination is not unreasonable merely because the habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). And a habeas court "must presume the state court's factual findings to be correct unless the petitioner rebuts the presumption with clear and convincing evidence." *House*, 527 F.3d at 1019 (citing 28 U.S.C. § 2254(e)(1)).

Ultimately, a habeas petitioner meets § 2254(d)'s "demanding standard only when he shows that the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Dunn v. Madison*, 138 S. Ct. 9, 11 (2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). If Robinson satisfies § 2254(d)'s demanding standard, this Court may then review his federal claim de novo, i.e., without deference to the OCCA's decision. *Milton v. Miller*, 744 F.3d 660, 670-71 (10th Cir. 2014). But even if this Court finds that a constitutional error occurred, this Court may not remedy the constitutional error unless Robinson also "show[s] that the error had a '"substantial and injurious effect or influence"' on the outcome of his trial." *Brown v. Davenport*, 142 S. Ct. 1510, 1519 (2022) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

### 2.      Claims that were procedurally defaulted in state court

Second, as to any federal claim that Robinson did not properly present to the OCCA, the procedural default doctrine bars this Court's review unless Robinson first shows cause for the procedural default and resulting prejudice or that a fundamental miscarriage of justice will occur if the Court does not review the claim. *Grant v. Royal*, 886 F.3d 874, 892 (10th Cir. 2018). If Robinson makes the showing necessary to overcome the procedural default of the claim that he

did not properly present to the OCCA, the Court will review the defaulted claim de novo. *Douglas*, 560 F.3d at 1171. But, again, even if the Court finds a constitutional error it may not grant relief unless Robinson also shows that the error was prejudicial under the *Brecht* standard. *See Davenport*, 142 S. Ct. at 1524 ("Today, then, a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [the Supreme Court's] equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests." (emphases in original).

### B.   Factual background

Sometime before June 27, 2013, Robinson, his fiancée Darian Grayson, and their young child moved into the house at 1125 South Maple, in Bartlesville, Oklahoma, and began living with Robinson's mother, Tammy Bridges, and Robinson's stepfather, Eddie Bridges. Dkt. 29-4, Tr. Trial vol. 2, at 10-17. Robinson's grandmother, Jean Sanders, lived next door at 1127 South Maple. *Id.* at 9.

On June 27, 2013, around 12:40 p.m., a man kicked in the back door of Roscoe and Molly White's house at 1028 Southwest Oak Avenue—just over one block from the Bridgeses' house. Dkt. 29-3, Tr. Trial vol. 1, at 195-206. The man walked through the back door and into the laundry room. *Id.* There, he encountered the White's adult daughter, Renee White, who also lived in the Whites' house. *Id.* Ms. White screamed at the man and told him to leave. *Id.* After several seconds, the man ran away, without taking any items from the house, and ran toward a nearby cemetery. *Id.* About two weeks later, Detective Nathan Mellen showed Ms. White a six-person photo lineup, and Ms. White identified Robinson as the man who burglarized the Whites' house. *Id.* at 204-05, 237-39, 242; Dkt. 29-5, at 1 (State's Exh. 1).

The State charged Robinson with one count of first-degree burglary, in violation of Okla. Stat. tit. 21, § 1431, and alleged that Robinson committed the crime after former conviction of two

or more felonies. Dkt. 29-7, O.R., at 23-24. Ms. White testified at Robinson's preliminary hearing that Robinson kicked in the back door of the Whites' house just before 1:00 p.m., on June 27, 2013, and "stood [in front of her] probably a good twenty seconds" in the laundry room, that she watched him as he ran away toward the White Rose Cemetery near the Whites' house, and that Robinson was wearing "a white T-shirt and black shorts." Dkt. 29-1, Tr. Preliminary Hr'g, at 4, 8, 11. Ms. White further described the shirt as "[k]ind of a muscle type shirt" with no sleeves. *Id.* at 11. Ms. White testified that when she described Robinson to law enforcement officers immediately after the burglary, she stated that he was "about five-eight, slender built," and possibly black or "half black" because he had "coarse" hair. *Id.* at 16-17. Ms. White also testified that she had identified Robinson in a photo lineup. *Id.* at 17-18.

Just over two weeks after the preliminary hearing, Ms. Tammie Lea Chidester, a friend of Robinson's family and fiancée, signed a handwritten letter stating that on June 27, 2013, "around 12:30 p.m.," she saw an acquaintance, Charles Fouts, Jr., run south toward the White Rose Cemetery "wearing [a] white muscle shirt and black shorts," that she believed he was a suspect in a robbery on Oak Street, and that Mr. Fouts spoke with her about the robbery later in the day on June 27, 2013. Dkt. 29-5, at 2 (State's Exh. 6); Dkt. 29-4, at 50-54, 61. Ms. Chidester provided the letter to Robinson's lawyer, Mr. Conatser, before Robinson's trial. Dkt. 29-4, at 51, 53-54, 61.

In December 2013, about one month before Robinson's trial, Mr. Conatser filed a First Disclosure Discovery Notice to the State of Oklahoma and Defense of Alibi, indicating that he anticipated Ms. Chidester would testify that she saw Mr. Fouts on June 27, 2013, about 12:30 p.m., running toward the White Rose Cemetery wearing a white muscle shirt and black shorts; that Ms. Sanders would testify that a man wearing a white T-shirt and dark shorts attempted to enter her backyard around 12:30 p.m. on June 27, 2013; that Mr. and Mrs. Bridges and Ms. Grayson would

testify that Robinson was with them, at the Bridgeses' house, all day on June 27, 2013; and that Mr. Bridges would testify that Robinson helped him install a window air conditioning unit at the Bridgeses' house between 10:30 a.m. and 1:00 p.m. that day. Dkt. 29-7, at 21-22.

The case proceeded to a jury trial in January 2014. Dkt. 29-7, at 32. Ms. White testified that she lived with her parents at 1028 South Oak Avenue. Dkt. 29-3, at 195-96. On June 27, 2013, around 12:40 p.m., Ms. White was home alone, with no cars parked in the driveway, when she heard a "very loud noise" at the back of the house. *Id.* at 196-98. Ms. White thought someone was trying to get into the house, so she walked to the laundry room to check the back door. *Id.* at 198-99. Ms. White saw a man standing in the laundry room, just a few feet inside the house. *Id.* at 199, 201. Ms. White testified that the man was about 5 feet, 8 inches tall with a "slender build," had short hair that was "thick" and "kind of coarse," and was "wearing a white T-shirt, muscle type shirt, and black shorts and some type of tennis shoes." *Id.* Ms. White testified she thought the man "looked like he could have been white, maybe black, half black or part black based on his hair." *Id.* Ms. White screamed at the man and told him to "get out." *Id.* at 200-01, 206. The man stared at Ms. White for about twenty seconds, as if he did not understand what she was saying. *Id.* at 200-01. The man then ran out of the house, without taking anything from the home, ran down an alley behind the house, and continued running south toward the White Rose Cemetery. *Id.* at 201-03. Ms. White called 911 to report the incident. *Id.* at 203. Ms. White testified that Detective Mellen showed her a series of photos on July 17, 2013, and that she circled and initialed Robinson's picture. *Id.* at 204-05; Dkt. 29-5, at 1 (State's Exh. 1). In the courtroom, Ms. White identified Robinson as the man who broke into her house. *Id.* at 206. Ms. White testified that sometime after October 5, 2013, she obtained several photographs of Robinson from his Facebook page, printed them out, and provided them to law enforcement. *Id.* at 206-09; Dkt. 29-5, at 5-7

(State's Exhs. 2, 3, 4). On cross-examination, Ms. White explained that she provided the additional photos to law enforcement after the preliminary hearing because, at that hearing, Robinson's "hair was shaved" and the photos from his Facebook depicted his hair as "longer and thicker" and demonstrated why she had described Robinson's "hair [as] being coarse" and why she thought Robinson "could possibly be half – have some black in him." Dkt. 29-3, at 212-13.[10]

Officer Tyler Diedrich testified he received a call from a 911 dispatcher, around 12:50 p.m., reporting a break in at 1028 Southwest Oak. Dkt. 29-3, at 224-26. Based on information he received from the dispatcher, Officer Diedrich searched the neighborhood near the White Rose Cemetery for "a medium complexion male wearing a white tank top and black shorts with dark hair" but did not find anyone. *Id.* at 226-28; Dkt. 29-7, at 74. When Officer Diedrich arrived at the Whites' house, he spoke with Ms. White and observed "fresh" damage to the back door that was "consistent with the door being forced open." Dkt. 29-3, at 228-29.

Detective Nathan Mellen testified that he prepared two copies of a six-person photo lineup, one copy that included names under each photo and one copy that included only photos without names; both copies included a photo of Robinson. Dkt. 29-3, at 236-38, 242-43; Dkt. 29-5, at 1, 8 (State's Exhs. 1, 5). He further testified that he presented only the six-person photo lineup that included photos without names to Ms. White on July 17, 2013, and that Ms. White circled and initialed Robinson's photo. Dkt. 29-3, at 237-39, 242; Dkt. 29-5, at 1 (State's Exh. 1).

Robinson presented five witnesses at trial. His grandmother, Ms. Sanders, testified she was home, on June 27, 2013, when she saw a man in a white shirt and "dark colored shorts" "trying to break in [her] back gate" between 12 p.m. and 12:30 p.m. Dkt. 29-4, at 9-12. Ms. Sanders

_____

[10] Ms. Grayson testified at trial that Robinson is "Caucasian" and the photos of Robinson in the six-person lineup and other trial exhibits suggest the same. Dkt. 29-4, at 42-43; Dkt. 29-5, at 1, 5-8 (State's Exhs. 1 through 5).

testified she and Robinson's mother, Mrs. Bridges, confronted the man, that she told the man she "was calling the police," that she "hollered at" Robinson who was next door, and that Robinson came over to the gate and ran the man off. Dkt. 29-4, at 10-11. Ms. Sanders did not report this incident to the police, but she did tell Robinson's lawyer, Mr. Conatser, about it after Robinson's arrest. *Id.* at 12-13. According to Ms. Sanders, on June 27, 2013, Robinson was wearing shorts and no shirt and was helping "redo the air conditioner in [the Bridgeses'] house." *Id.* at 14-16. Ms. Sanders was certain Robinson was home all day and testified that it would have been "impossible" for Robinson to leave "for ten minutes at any point" because Robinson and Ms. Grayson were "running back and forth getting stuff for the baby and working on the air conditioner." *Id.* at 16.

Mrs. Bridges testified that her central air conditioning unit stopped working on June 27, 2013. Dkt. 29-4, at 19-21. Mrs. Bridges testified that Mr. Bridges called in to work that morning, that her mother-in-law went to Walmart to buy a window air conditioning unit, and that Robinson did not leave the house at any time that day because it took over three hours to install the window unit. *Id.* at 21-24. On cross-examination, Mrs. Bridges testified that Robinson was wearing blue and white shorts, with no shirt, and his head was "shaved." *Id.* at 26-27. Ms. Bridges testified that Robinson had, at times, worn his hair longer, that "when he was in jail he had braids," and that he sometimes wore his hair in "little ponytails." *Id.* at 26. Ms. Bridges also testified that the photos Ms. White had retrieved from Robinson's Facebook page depicted his various hairstyles and that one of those photos was taken when Robinson was "in a halfway house." *Id.* at 26-27.[11] Mrs.

---

[11] The prosecutor did not elicit Mrs. Bridges's testimony that Robinson was previously in jail and a halfway house. Rather, Mrs. Bridges volunteered this information when the prosecutor asked about Robinson's hairstyles and asked if the Facebook photos depicted those hairstyles. Dkt. 29-4, at 26-27. After the second reference to Robinson's prior incarceration, the prosecutor told Mrs. Bridges to answer the questions asked. *Id.* at 27.

Bridges testified that she had a receipt showing that her mother-in-law purchased the window air conditioning unit on June 27, 2013, but she did not bring the receipt to trial because no one asked her to do so. Dkt. 29-4, at 27-28.[12]

Mr. Bridges testified that he stayed home from work on June 27, 2013, that Robinson helped him install a window air conditioning unit, and that he was positive Robinson did not leave the house for any reason because Robinson was "with [him] all day." Dkt. 29-4, at 29-33, 35. According to Mr. Bridges, Robinson wore "shorts and no shirt most of the day." *Id.* at 36. Mr. Bridges testified it took most of the day to install the window unit because he "had to make modifications to the window and wire it direct." *Id.* at 32. On cross-examination, Mr. Bridges testified that Robinson was never out of his sight on June 27, 2013. *Id.* at 34-35. The prosecutor then asked, "So [Robinson] never went to the restroom the entire day?" *Id.* at 35. Mr. Bridges responded, "Yeah, but the restroom is right there," and explained that Robinson generally does not close the door when he goes to the bathroom. *Id.* Mr. Bridges testified he was not aware that Robinson confronted anyone in Ms. Sanders's backyard, but Mr. Bridges thought that Mrs. Bridges and Ms. Sanders ran someone off that day. *Id.* at 36-37. Mr. Bridges testified it would take about five minutes to walk from his house to the Whites' house on Oak Street. *Id.*

Robinson's fiancée, Ms. Grayson, testified that she and Robinson were together all day on June 27, 2013, at the Bridgeses' house and that Robinson could not have left for any reason because he was installing an air conditioner and he and Mr. Bridges had to "cut the wall out." Dkt. 29-4, at 38-41. Ms. Grayson testified that, as far as she was aware, Robinson did not go next door to

---

[12] Immediately after Mrs. Bridges testified that she did not bring the receipt for the window air conditioning unit, the trial court asked the prosecutor if he would like to take a break to have Mrs. Bridges retrieve the receipt. Dkt. 29-4, at 28. The prosecutor declined and stated he would "let Mr. Conatser make that motion." *Id.* Mr. Conatser did not make that motion and instead stated he had no further questions for Mrs. Bridges. *Id.*

Ms. Sanders house for any reason. *Id.* at 40-41. According to Ms. Grayson, Robinson was wearing "baby blue shorts and tennis shoes" that day. *Id.* at 41-42. Ms. Grayson testified that Robinson is "Caucasian," that he has several tattoos, and that his neck and arm tattoos are visible when he wears a sleeveless shirt. Dkt. 29-4, at 42-43. On cross-examination, Ms. Grayson testified that there was a "ruckus in the backyard" at Ms. Sanders house next door, that she did not think that Robinson was involved, and that Robinson may have gone next door while Ms. Grayson was focused on cooking and caring for their child. *Id.* at 44-45. The prosecutor showed Ms. Grayson the photos Ms. White retrieved from Robinson's Facebook page and asked if Robinson was depicted in both photos. *Id.* at 47-48. Ms. Grayson responded, "Yes, it is" and, when the prosecutor asked Ms. Grayson to return the photos to him, she volunteered, "I wasn't with Keith. He was in prison." *Id.* at 48. The prosecutor told Ms. Grayson that it was "very important" that she just answer the questions asked. *Id.*

Lastly, Ms. Chidester testified that she is a friend of Robinson, Ms. Grayson, and Robinson's family, and that her aunt formerly was married to Mr. Bridges. Dkt. 29-4, at 51, 54-55. Ms. Chidester testified that she lived at 1042 South Hickory Avenue and that her mother lived at 1031 South Hickory Avenue. *Id.* at 51-52. Ms. Chidester testified that on June 27, 2013, she was sitting on the front porch of her mother's house, "right behind" the White Rose Cemetery, and she was talking to her family when she heard "a loud noise." *Id.* at 52-53. Ms. Chidester saw "somebody run out in a black pair of shorts, a white tank top, [and] black shoes running down the alley by the cemetery." Dkt. 29-4, at 52. According to Ms. Chidester, the person she saw running

went to "[t]he back gate." *Id.* at 53.[13]  Ms. Chidester testified she did not immediately share this information with anyone but, at some point, she sent a letter to the district attorney's office because she wanted to help Ms. Grayson and because she "knew the dude that was running in the alley." Dkt. 29-4, at 53-54.  Ms. Chidester testified that when she wrote the letter, she did not know Robinson was "in trouble." *Id.* at 54.  Ms. Chidester also testified that her mother told her that Robinson was in trouble before Ms. Chidester wrote the letter. *Id.* at 55.

Immediately after Ms. Chidester's direct examination, the trial judge ordered a ten-minute recess, directed the jury to remain in the jury room, and asked Mr. Conatser and the prosecutor, Mr. Drake, to join him in chambers.  Dkt. 29-4, at 56.[14]  The following discussion occurred in chambers:

> THE COURT:          Show we're in chambers.  The jury is not present and Ms. Chidester is in the middle of – just finished her direct examination.
>
> According to the records of the jail, Ms. Chidester was in the jail on June 27, 2013, and posted bond that day, was not released until 1:35 p.m.  What time did this crime occur?
>
> MR. DRAKE:          12:50.  It was reported at 12:50.  That's what the witnesses say.
>
> THE COURT:          So you want to go talk to Ms. Chidester and see if she wants to continue with her testimony or whether we need to address the fact that she's maybe committing perjury, Mr. Conatser?
>
> MR. CONASTER:     Well, I don't think – I didn't – I hope you're not holding me on this.  All I had was a letter from her.
>
> THE COURT:          I'm not holding you on anything.

---

[13] It is not clear from the trial transcript whether Ms. Chidester was referring to a cemetery gate or some other gate.  Chidester testified the person she saw ran toward the cemetery and, when Mr. Conatser inquired how far the person went, Ms. Chidester first stated, "He just went to the - - to the gate," and she later stated, "[t]he back gate." Dkt. 29-4, Tr. Trial vol. 2, at 53.

[14] It is not clear from the record whether Robinson attended the chambers meeting.  Dkt. 29-4, Tr. Trial vol. 2, at 56.

MR. CONASTER:  I took the letter to the D.A. also.

THE COURT:  I'm just telling you that.

MR. CONASTER:  Okay.  I'll ask her whether she wants to withdraw her statement.

THE COURT:  That's right.  Because she's getting ready – well, I'm going to do a record on it if she continues to testify.  Here's the bond that she did.  Do you want to ask her if that's her?  Her name is Tammie Lea Chidester.

MR. CONASTER:  That's what I understand.

MR. DRAKE:  That's her, Judge.

THE COURT:  Go ask her if that's her and if she wants to continue with this testimony and we'll make a record on it.  So go talk to her right now.  Ask her if she was really there or still in jail at 12:50.

Dkt. 29-4, at 56-58.

After this discussion, both attorneys and the trial judge returned to the courtroom, and the

trial judge questioned Ms. Chidester, outside the presence of the jury:

THE COURT:  You have testified here today that on June 27, 2013, that you observed a – well, you testified what you did around noon time or around 12:30 that you observed all that.  Were you not in fact in jail at that time?

MS. TAMMIE[15] CHIDESTER:  Yes, sir.  But I got out between one and 1:30.

THE COURT:  You got out at 1:35, ma'am.  That's what the jail says.  So you're saying that this deal happened?

MS. TAMMIE CHIDESTER:  Yes, sir.

THE COURT:  You understand the penalty of perjury?

MS. TAMMIE CHIDESTER:  Yes, sir.

THE COURT:  That you could be charged with a felony if you – if this is proven not to be true?

MS. TAMMIE CHIDESTER:  Yes.

---

[15] In this portion of the trial transcript, Ms. Chidester's name is misspelled as "Tammy." To avoid confusion, the Court has used the correct spelling of "Tammie."

THE COURT:       Okay.  So you do not wish to withdraw your statement and you're going to continue to make the statement that you observed all this after 1:35 on June 27th?

MS. TAMMIE CHIDESTER:       Yes, sir.

THE COURT:       All right.  Let's have the jury come in.  She can be cross-examined.

Dkt. 29-4, Tr. Trial vol. 2, at 58-59.

On cross-examination, Mr. Drake elicited testimony that Ms. Chidester had misidentified Robinson in the courtroom during direct examination and that she previously had been convicted of concealing stolen property.  Dkt. 29-4, at 60.  Mr. Drake asked Ms. Chidester to identify the letter she sent to the district attorney's office describing the incident she witnessed on June 27, 2013.  *Id.* at 61.  Ms. Chidester testified she saw a man in a white shirt and black shorts running toward the cemetery between 1:00 and 1:30 p.m.  Dkt. 29-4, at 61-62.  Ms. Chidester admitted that she stated in her letter that she witnessed this same incident at 12:30 p.m.  *Id.* at 62.  The prosecutor then asked, "And so, Ms. Chidester, you're saying it now happened between one and 1:30?"  Dkt. 29-4, at 62.  Ms. Chidester responded, "Yes, it did."  *Id.*  She then testified that she was in jail on June 27, 2013, and the following colloquy occurred:

Q       The Washington County Jail?

A       Yes, sir.

Q       Okay.  And that day you made bond at 1:35.  Is that correct?

A       Correct.  No.  Misty came up and got me between one - -

MR. DRAKE:       Judge, may I approach?

THE COURT:       Yes, you may.

MR. DRAKE:       I'd ask for that document, Judge.  Mr. Conatser, it's the document you've already seen.

19

| Q | (By Mr. Drake)  Ms. Chidester, I'll take six back from you, ma'am. I'll hand you No. 7.  And, Ms. Chidester, that photograph, I know it's not very good, it's black and white, but that's you.  Is that correct? |
|---|---|
| A | Correct. |
| Q | On the second page of that document it shows your release at 1:35 p.m.  So that document must be wrong.  Is that correct? |
| A | No, sir. |
| Q | Okay.  That's kind of a confusing answer.  Is the document wrong? |
| A | No. |
| Q | Okay.  So, Ms. Chidester, now I've got this important question to ask you.  How were you in two places at the same time? |
| A | I wasn't. |
| Q | Okay.  Well, since we know the document is not wrong, you told us that, that means you were in the county jail, right? |
| A | Uh-huh.  Yes, sir. |
| Q | That means you didn't get out of the county jail until 1:35, right? |
| A | Correct. |
| Q | So, Ms. Chidester, you couldn't have seen this guy at one to 1:30 or at 12:30 to whatever time you said before.  You didn't see this happen, did you? |
| A | I did, sir.  I seen the guy run in the alley with the black shorts on. |
| Q | Well - - |
| A | That I did see. |
| Q | Well, Ms. Chidester, we know from other testimony in this case that it was reported to the police at 12:50 p.m.  Okay.  So we know it happened before 12:50 p.m.  So this guy is just running all over Oak and Maple for like two hours.  Is that where we're at here? |
| A | No. |
| Q | Okay.  Ms. Chidester, you told us you know who it was.  Who did all this?  What's that guy's name? |

| A | C.J. |
|---|------|
| Q | Who is C.J.? |
| A | I don't know his last name. All I know is it's C.J. |
| Q | Well, you knew his name in this letter, didn't you? |
| A | Yes. |
| Q | So you have forgotten his name since you wrote this letter? |
| A | No. I don't know his last name. I never knew his last name. I just know it was C.J. |
| Q | Ms. Chidester, you wrote in the letter Charles Fouts, Jr. Is that correct? |
| A | That is correct. |
| Q | So is that who C.J. is? |
| A | Yes. |
| Q | Would you have recognized C.J. if you saw a picture of him? |
| A | Yes, I do. |

Dkt. 29-4, at 61-65; *see also* Dkt. 29-5, at 2-4 (State's Exhs. 6, 7). Mr. Drake then presented two

photographs to Ms. Chidester. Dkt. 29-4, at 65. She identified the person in both photographs as

Mr. Fouts and agreed with Mr. Drake's assessment that Mr. Fouts and Robinson do not "look

anything alike." *Id.* at 65-66; *see also* Dkt. 29-5, at 9-10 (State's Exhs. 8, 9). After Mr. Drake

completed his cross-examination of Ms. Chidester, the defense rested. Dkt. 29-4, at 67. Mr. Drake

then "ask[ed] to introduce State's 6 which is [Ms. Chidester's] letter and State's 7 which is the

document the court had earlier," and the trial court admitted both exhibits. *Id.*

During the instructions conference, trial counsel did not request an instruction on the

defense of alibi or an instruction on any lesser included offenses. Dkt. 29-4, at 68-73. As

previously stated, the jury found Robinson guilty of first-degree burglary, after former conviction

of two or more felonies, and recommended a 23-year prison sentence and a $500 fine, and the trial

court sentenced Robinson accordingly.  Dkt. 29-7, O.R., at 66-67; Dkt. 29-6, Tr. Sentencing Hr'g,

at 4.

### C.    Analysis

#### 1.    Claim one:  insufficient evidence

Robinson first claims the State deprived him of his Fourteenth Amendment right to due

process because it did not prove, beyond a reasonable doubt, every essential element necessary to

support his first-degree burglary conviction.  Dkt. 1, at 3; Dkt. 3, at 12-15.  As he did on direct

appeal, Robinson specifically alleges the State did not prove that he intended to commit larceny

when he broke into the Whites' house.  Dkt. 3, at 12-16; Dkt. 28-2, at 16-21.

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal

case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to

constitute the crime with which he is charged.'"  *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)

(quoting *In re Winship*, 397 U.S. 358, 364 (1970)).  When a criminal defendant challenges the

sufficiency of the evidence on direct appeal, the reviewing court must consider the evidence

presented at trial in the light most favorable to the State and determine whether "*any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at

319 (emphasis in original).

Applying the *Jackson* standard, the OCCA rejected Robinson's claim.  The OCCA

understood his claim as alleging the evidence failed to establish intent to commit larceny and

stated, without discussing the evidence, "Viewing the evidence in the light most favorable to the

State, any rational trier of fact could have found the essential elements of First-Degree Burglary

beyond a reasonable doubt."  Dkt. 28-1, at 2.  Robinson contends the OCCA "unreasonably

applied" *Jackson* and unreasonably determined the facts because, even viewing the facts in the

State's favor, "there is no evidence of intent to commit any crime other than a misdemeanor." Dkt.

3, at 15. Harvanek contends § 2254(d) bars relief because the OCCA's decision is not contrary to

*Jackson* and is legally and factually reasonable. Dkt. 28, at 13-19.

The Court agrees that § 2254(d) bars relief. To sustain a conviction for first-degree

burglary, as charged in this case, the State had to prove, beyond a reasonable doubt, that Robinson

(1) broke into and (2) entered (3) a dwelling (4) of another (5) when a human was present (6) with

the intent to commit larceny. Okla. Stat. tit. 21, § 1431 (2011); Dkt. 29-7, O.R., at 42, 45-46.[16]

As presented on direct appeal and as reasserted in this proceeding, Robinson's sufficiency

challenge rests on the absence of direct evidence of his intent. But "'[i]ntent' may be proven via

circumstantial evidence; in fact, it is rarely established by other means." *United States v. Nguyen*,

431 F.3d 1170, 1175 (10th Cir. 2005). It was objectively reasonable for the OCCA to conclude

that the State presented sufficient circumstantial evidence for any rational juror to conclude,

beyond a reasonable doubt, that Robinson intended to commit larceny when he broke into the

Whites' house. Ms. White testified she was home alone and that no cars were parked in the

driveway when Robinson kicked in the back door and entered the laundry room. Dkt. 29-3, Tr.

Trial vol. 1, 195-206. Ms. White testified she had never met Robinson, he seemed surprised to see

her when she confronted him in the laundry room, and he ran out of the house without taking any

items. *Id.* There was no evidence that Robinson harmed, or even threatened to harm, Ms. White.

Dkts. 29-3, 29-4. Viewing the evidence in the State's favor, any rational juror could have

concluded, beyond a reasonable doubt, that Robinson broke into the Whites' house—a house that

---

[16] Under Oklahoma law, larceny is (1) taking, (2) carrying away, (3) personal property, (4)
of another, (5) of value, (6) by fraud/stealth, (7) with intent to deprive another permanently. Okla.
Stat. tit. 21, § 1701 (2011).

from the outside appeared to be unoccupied—with the intent to commit larceny but that his unexpected encounter with Ms. White prevented him from committing that crime. *See, e.g.*, *Dewberry v. Patton*, 672 F. App'x 821, 823-24 (10th Cir. 2016) (concluding district court properly denied habeas relief as to petitioner's claim that the state failed to prove intent to commit larceny when evidence established that petitioner and co-defendant burglarized a warehouse but left "empty-handed" after triggering an audible alarm system); *Dockins v. Hines*, 374 F.3d 935, 393-40 (10th Cir. 2004) (considering challenge to the sufficiency of evidence of "intent to steal" to support second degree burglary conviction under Oklahoma law, finding that "[w]hether the evidence-and any reasonable inferences that might be drawn from it-was sufficient to convince a rational juror beyond a reasonable doubt that [the habeas petitioner] had the requisite intent to steal is a close question," and reasoning that even if the OCCA's decision under *Jackson* was "incorrect," "the reasonableness of the OCCA's judgment [was not] fairly debatable").

Because the OCCA reasonably applied *Jackson* and reasonably determined the facts relevant to this claim, § 2254(d) bars relief and the Court denies the petition as to claim one.

### 2.    Claim two:  judicial bias/judicial intervention

Next, Robinson claims he was denied his Fourteenth Amendment right to due process because the trial judge demonstrated bias when "the judge departed from his role as a neutral jurist and assumed the duty of the prosecutor" by independently obtaining a document from the Washington County Jail showing that Ms. Chidester was detained at the jail until 1:35 p.m. on the day of the burglary and by providing that document to the prosecutor who then used the document to discredit Ms. Chidester's testimony.  Dkt. 1, at 4; Dkt. 3, at 16-21.

"Due process guarantees 'an absence of actual bias' on the part of a judge."  *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955))); *see also*

*Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (explaining that the Fourteenth Amendment's Due Process Clause "establishes a constitutional floor" that "requires a 'fair trial in a fair tribunal' . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case" (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975))); *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991) (noting that "[t]he entire conduct of the trial from beginning to end is obviously affected . . . by the presence on the bench of a judge who is not impartial").

Robinson claimed on direct appeal that the trial judge deprived him of his right to a fair trial before an unbiased judge, as guaranteed by the Oklahoma Constitution and state court decisions interpreting the same, by "investigating" Ms. Chidester "and obtaining evidence with which to impeach [her]." Dkt. 28-2, at 22-29. Robinson alleged that State's Exhibit 7, Ms. Chidester's jail records, had been sent to the trial judge's fax number and argued, "While the impeachment of Ms. Chidester by the prosecution would have been proper had it been born of the State's own investigative efforts, it was not proper for the court to seek out such information and provide it to the State for its use." *Id.* at 26-29.

Relying primarily on state law and reviewing this claim under its plain-error standard, the OCCA rejected Robinson's claim for several reasons. First, the OCCA reasoned that "the record is silent as to how the trial court became aware of the information contained in Chidester's jail records" because "[t]rial counsel did not make a record on this issue." Dkt. 28-1, at 3. Second, the OCCA reasoned that, "[a]t best, the record shows the trial court questioned Chidester outside the presence of the jury concerning whether she had committed perjury on direct examination." *Id.* at 4. On this point, the OCCA acknowledged that a trial court's questioning of a witness regarding potential perjury could, under some circumstances, violate a defendant's right to due process. *Id.* (citing *Webb v. Texas*, 409 U.S. 95, 98 (1972)). But the OCCA reasoned that "the

trial court's in camera questioning of Ms. Chidester certainly did not" dissuade Ms. Chidester from testifying because she "resumed the witness stand for cross-examination during which she maintained the truth of her earlier testimony." *Id.* Third, the OCCA noted that Robinson's "real complaint is that the prosecutor utilized the jail record information to impeach Chidester." Dkt. 28-1, at 4. The OCCA then reasoned:

> The trial court's purpose in disclosing this information to the parties, and in questioning Chidester about it during the in camera hearing, was two-fold. First, a witness may not testify to any matter unless he or she has personal knowledge of the matter. 12 O.S. 2011, § 2602. If, as the jail records suggested, Chidester was in custody at the time of the burglary, then she had no personal knowledge of anything going on in the victim's neighborhood and was not a competent witness in the case. The trial court appropriately questioned Chidester about her precise whereabouts at the time of the burglary in light of the jail records to determine whether she in fact was a competent witness who could provide relevant testimony.
>
> More importantly, however, Oklahoma law demands the trial court "shall exercise control over the manner and order of interrogating witnesses and presenting evidence so as to . . . [m]ake the interrogation and presentation effective for the ascertainment of the truth[.]" 12 O.S. 2011, § 2611(A)(1). Once the trial judge became aware of the information from Chidester's trial records, he did not abuse his discretion by inquiring of Chidester whether her testimony on direct examination was false. In essence, the trial court sought to ascertain whether Chidester was perpetrating a fraud on the court.

*Id.* at 4-5 (ellipses and alterations in original). Based on this reasoning, the OCCA concluded that "the trial court did not abuse its discretion with the inquiry of Chidester, advising her of the jail records in light of her palpable perjury." *Id.* at 5. Fourth, the OCCA reasoned that the fact that "the prosecutor used the jail record information to impeach Chidester does not amount to plain error attributable to the trial court." *Id.* at 5. The OCCA stated,

> Assuming *arguendo* the prosecutor was not already in possession of this information (the record is also silent on this point), no plain error arises because the trial court did nothing more than carry out its lawful duties in overseeing [Robinson's] trial. [Robinson] fails to establish actual bias in the court's handling of his trial by showing the court took actions that "were improper or unfair to him." *Brumfield v. State*, 2007 OK CR 10, ¶ 30, 155 P.3d 826, 838. That is especially so considering Chidester took the stand and maintained the truth of her version of events.

26

*Id.* at 5-6.

Robinson contends the OCCA's decision is contrary to or involved an unreasonable application of *Fulminante* and is based on an unreasonable determination of the facts because the evidence presented to the OCCA "showed that the judge was biased and intentionally waited until after the defense direct examination in an attempt to ambush [Robinson] and harm him in the eyes of the jury." Dkt. 3, at 20-21.[17] Harvanek urges the Court to deny relief for two reasons. First, Harvanek contends Robinson procedurally defaulted claim two because Robinson relied on state law to support the judicial bias claim he presented to the OCCA. Dkt. 28, at 28-29. Second, Harvanek contends that even if Robinson fairly presented a federal claim to the OCCA, § 2254(d) bars relief because clearly established federal law requires a showing of actual bias and the OCCA reasonably determined that Robinson did not establish actual bias. *Id.* at 31-37.

Preliminarily, the Court agrees with Harvanek that Robinson did not cite any federal law in his state appellate brief to support his judicial bias claim. Dkt. 28-2, at 22-29. Ordinarily, this would result in a procedural default of a federal claim. *See Prendergast v. Clements*, 699 F.3d 1182, 1184 (2012) (noting that a habeas petitioner must present a federal claim in state court "in a manner sufficient to put the [state] court[] on notice of the federal constitutional claim"); *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (explaining that a habeas petitioner does not fairly present a federal claim in state court by merely "presenting all the facts necessary to support the

---

[17] Robinson also alleges the OCCA should not have presumed his trial judge, Curtis DeLapp (who later resigned), was impartial given that "the judge's atrocious conduct in numerous cases has [been] proven." Dkt. 3, at 21. As Harvanek contends, this Court cannot consider this argument because Robinson did not present it, or any evidence to support it, to the OCCA, and Robinson acknowledges that this argument is based on events that occurred after the OCCA issued its decision. Dkt. 28, at 30-31; Dkt. 1, at 4; *see Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (noting that when § 2254(d) applies, a habeas court's review "focuses on what a state court knew and did").

federal claim to the state court or articulating a somewhat similar state-law claim"). But here, the OCCA thoroughly addressed Robinson's claim and, at least in part, understood that his claim implicated his federal constitutional right to due process. The Court thus finds it appropriate to presume the OCCA adjudicated the merits of Robinson's federal claim and further finds that § 2254(d) informs this Court's analysis of claim two. *See Richter*, 562 U.S. at 98-99 (noting that AEDPA's deferential framework applies even if state court silently adjudicates a federal claim).

Nonetheless, the Court concludes that § 2254(d) bars relief. As just stated, Robinson asserts the OCCA's decision is contrary to or based on an unreasonable application of *Fulminante*. Dkt. 3, at 20-21. But the *Fulminante* Court mentioned judicial bias in the context of discussing examples of structural errors, not in analyzing a judicial bias claim. *Fulminante*, 499 U.S. at 294-95. So *Fulminante* would not have informed the OCCA's analysis of a federal claim alleging judicial bias. Harvanek cites cases that focus on when due process requires a trial judge to recuse from a case and asserts that clearly established federal law requires a showing of "actual bias," i.e., a showing that the trial judge should have recused based on "a direct, personal, substantial pecuniary interest in reaching a conclusion against [the defendant] in his case," or requires a showing that the trial court was "overzealous" in questioning a witness or the defendant. Dkt. 28, at 32-36. Neither party, however, identifies clearly established federal law that governs the core of Robinson's complaint which, as the Court understands it, asserts that the trial court impermissibly intervened in the trial on the State's behalf by obtaining evidence that the prosecutor used to discredit Ms. Chidester's testimony. And the Court's independent search of the law shows that federal law on this issue is murky, not clearly established.

Decades ago, the United States Court of Appeals for the Second Circuit described "the standards to be applied when a federal habeas court is asked to determine whether the conduct of

a state court trial judge has denied a criminal defendant the constitutionally mandated measure of fairness" as "ill-defined." *Johnson v. Scully*, 727 F.2d 222, 226 (2d Cir. 1984). The Second Circuit explained:

> A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits.

*Johnson*, 727 F.2d at 226 (quoting *Daye v. Att'y Gen.*, 712 F.2d 1566, 1572 (2d Cir. 1983)); *see also Brinlee v. Crisp*, 608 F.2d 839, 853 (10th Cir. 1979) (noting that "a trial judge should never evince the attitude of an advocate," but explaining that "[u]nless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction"); *United States v. Pinkey*, 548 F.2d 305, 308-10 (10th Cir. 1977) (discussing judicial conduct and courtroom management techniques that ordinarily do not violate due process). To the extent the Supreme Court has considered due process implications of judicial comments or conduct, those decisions generally "arose under [the Supreme] Court's supervisory power over federal courts; they set no clearly established constitutional limits under AEDPA." *Wong v. Smith*, 562 U.S. 1021, 131 S. Ct. 10, 12 (2010) (Alito, J., dissenting from denial of certiorari). In one of those cases involving the Supreme Court's supervisory power over federal courts, the Supreme Court determined that a federal defendant was deprived of due process when the trial judge expressed to the jury his opinion "that every single word that [defendant] said, except when he agreed with the Government's testimony, was a lie." *Quercia v. United States*, 289 U.S. 466, 468 (1933). The *Quercia* Court reasoned that the trial judge's instructions to the jury that the judge's opinion was "not binding" did not cure the prejudice created by the judge's opinion because "the judge put his own experience, with all the weight that could be attached to it, in the scale against the accused," not based on the judge's summation of the evidence presented

at trial, but based on the judge's personal view the defendant's action of "wip[ing] his hands during his testimony" was indicative of lying. 289 U.S. at 468-72.

In *Pinkey*, the United States Court of Appeals for the Tenth Circuit considered a question more like the one presented here, but that case also involved the circuit court's supervisory power over a federal district court. The federal defendant in that case, who represented himself at trial, alleged, in part, that the trial judge denied him a fair trial "by having suggested to the United States Attorney (out of the presence of the jury) that the handwritten suggested voir dire questions prepared by [the defendant] should be furnished to the Government's handwriting expert for handwriting analysis" after the expert witness had already identified several exhibits as depicting the defendant's handwriting. *Pinkey*, 548 F.2d at 307.[18] In addressing this claim, the Tenth Circuit, in part, cited the following passage from *Quercia*:

> In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. *Herron v. Southern Pacific Co.*, 283 U.S. 91, 95, 51 S. Ct. 383, 75 L. Ed. 857. In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important; and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.

*Pinkey*, 548 F.3d at 309 (quoting *Quercia*, 289 U.S. at 469). The Tenth Circuit also drew similar principles about permissible judicial conduct from its own decisions. Summarizing those principles, the Tenth Circuit stated,

---

[18] The defendant in *Pinkey* was tried and found guilty of using the United States mails to perpetrate a scheme to defraud and obtain money, in violation of 18 U.S.C. §1341, while he was incarcerated in Colorado, and the Government introduced at trial several letters the defendant mailed from prison seeking money from widows for debts he claimed were owed to him by their deceased husbands. *Pinkey*, 548 F.2d at 306-07.

> In the administration of the criminal justice system, the trial judge has the obligation of safeguarding the rights of the accused while at the same time protecting the interests of society. The adversary nature of criminal proceedings does not prohibit the trial judge from taking proper steps to aid and assist the jury in the truth finding quest leading to the proper determination of guilt or innocence. In the promotion of this goal, the trial judge has an obligation, on his own initiative, at proper times and in a dignified, and impartial manner, to inject certain matters into the trial which he deems important in the search for truth.

*Pinkey*, 548 F.3d at 308. The Tenth Circuit also recognized that a trial judge "has the right to participate in eliciting the truth" but must "be careful not to become an advocate for any of the parties." *Id.* at 309 (quoting *Ayash v. United States*, 352 F.2d 1009 (10th Cir. 1965)); *see also Fischer v. United States*, 212 F.2d 441, 444 (10th Cir. 1954) (rejecting federal defendant's contention that the trial court advocated on the Government's behalf when the court "directed the District Attorney to pursue a line of questioning to 'find out where, and when, and under what circumstances' an incident occurred" and reasoning that one function of the trial court "is to see that all relevant facts are brought intelligibly to the attention of the jury and [the court] may intervene in the conduct of the trial for this purpose"). Ultimately, the Tenth Circuit concluded in *Pinkey* that the trial court did not abuse its discretion by allegedly advocating on the Government's behalf when it suggested, outside the presence of the jury, that the Government's attorney should provide the defendant's handwritten questions to the Government's handwriting expert for analysis. *Id.* at 307-10. The Tenth Circuit also noted as relevant that the defendant in *Pinkey* did not "object to the trial court's action in regard to the court's suggestion that the Government conduct further examination of its handwriting expert." *Id.* at 310.

Based on the foregoing, and for three reasons, this Court concludes that § 2254(d) bars relief as to claim two. First, as just discussed, there does not appear to be any Supreme Court precedent clearly establishing when or "whether the conduct of a state court trial judge has denied a criminal defendant the constitutionally mandated measure of fairness" that the Due Process

Clause demands. *Johnson*, 727 F.2d at 226. As a result, Robinson cannot show, under § 2254(d)(1), that the OCCA's decision on his due process claim either is contrary to or based on an unreasonable application of clearly established federal law.

Second, to the extent the Supreme Court's decision in *Quercia* could be considered clearly established federal law on the issue of when judicial intervention by a state trial judge may violate due process, the OCCA's decision is neither contrary to nor based on an unreasonable application of *Quercia*. As previously stated, *Quercia* acknowledges that a trial judge may "assist the jury in arriving at a just conclusion by explaining and commenting on the evidence" and "by drawing their attention to the parts of it he thinks important." 289 U.S. at 469. And here, the trial judge did not go this far. Rather, like the trial judge in *Pinkey*, the trial judge here suggested to the prosecutor, outside the jury's presence, that certain evidence might aid the jury in ascertaining the truth. And, like the defendant in *Pinkey*, Robinson did not object to the trial judge's intervention. Thus, § 2254(d)(1) bars relief.

Third, Robinson has not shown, under § 2254(d)(2), that the OCCA's decision rests on an unreasonable determination of the facts. Significantly, after noting that the record was not sufficiently developed to determine "how the trial court became aware" of Ms. Chidester's jail records, Dkt. 28-1, at 3, the OCCA ultimately adopted Robinson's view of the facts—by assuming that the trial court obtained and alerted the prosecutor to the jail records—and determined even on those assumed facts that Robinson failed to show "actual bias" or that the trial judge's actions "were improper or unfair." Dkt. 28-1, at 3-6. Because this conclusion rests on an understanding of the factual landscape as Robinson would have it, he cannot show that the OCCA's decision rests on an unreasonable determination of the facts. Thus, § 2254(d)(2) bars relief.

For these reasons, the Court denies the petition as to claim two.

32

### 3. Claim three: lesser-included-offense instruction

In his third claim, Robinson contends the trial court violated his Fourteenth Amendment right to due process when the trial court did not instruct the jury on the lesser included offense of breaking and entering without permission, under Okla. Stat. tit. 21, § 1438(B), a misdemeanor. Dkt. 1, at 5; Dkt. 3, at 21-25. Robinson admits that trial counsel did not request this instruction but argues that had the trial court fulfilled its own obligation to properly instruct the jury, the jury could have found him guilty of the lesser offense and acquitted him of first-degree burglary given the weakness of the State's evidence that he intended to commit larceny when he broke into the Whites' house. Dkt. 3, at 22-24.

Applying state law, the OCCA denied relief, reasoning that Robinson was "not entitled to a jury instruction on any lesser-included offense" because he "proclaimed his innocence in defending this case by presenting an alibi defense at the jury trial." *Id.*; *see Harney v. State*, 256 P.3d 1002, 1005-06 (Okla. Crim. App. 2011) ("This Court has long recognized the rule of law that a defendant is not entitled to instructions on any lesser included offense when he defends against the charge by proclaiming his innocence.").

Robinson contends the OCCA's decision is contrary to or based on an unreasonable application of *Keeble v. United States*, 412 U.S. 205 (1973), and *Mathews v. United States*, 485 U.S. 58 (1988). Dkt. 3, at 25. He further contends the OCCA's decision is based on an unreasonable factual determination, arguing that because he did not testify at trial, he did not proclaim his innocence. Dkt. 3, at 25. Harvanek contends that § 2254(d) bars relief because there is no clearly established federal law that requires a state trial court to instruct a jury on lesser included offenses in a noncapital case and because the OCCA reasonably determined the facts necessary to adjudicate this claim. Dkt. 28, at 37-39.

33

For two reasons, the Court denies claim two. First, as Harvanek contends, Robinson cannot show that the OCCA's decision is either contrary to or based on an unreasonable application of clearly established federal law. The Tenth Circuit has repeatedly held that there is no clearly established federal law requiring a state trial court to instruct the jury on lesser included offenses in a noncapital case. *See, e.g.*, *Dewberry*, 672 F. App'x at 823 (concluding that habeas petitioner "failed to assert a cognizable claim for habeas relief" when petitioner argued the trial court violated his right to due process by failing to instruct the jury on the lesser included offense of breaking and entering because "there is no federal constitutional right to a lesser included offense instruction in a non-capital case"); *Dockins*, 374 F.3d at 938 (rejecting habeas petitioner's request for a certificate of appealability as to claim that a state "trial court improperly refused defense counsel's request for a jury instruction on the lesser included offense of breaking and entering without permission because "[t]he Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases"); *Lujan v. Tansy*, 2 F.3d 1031, 1036 (10th Cir. 1993) (explaining that "a petitioner in a non-capital case is not entitled to habeas relief for failure to give a lesser-included offense instruction even if in [the federal court's] view there was sufficient evidence to warrant the giving of an instruction on a lesser included offense").

And, contrary to Robinson's argument, neither *Keeble* nor *Mathews* clearly establish that the Constitution requires a state trial court to give an unrequested lesser included offense instruction in a noncapital case. In *Keeble*, the Supreme Court held "that where an Indian is prosecuted in federal court under the provisions of the [Major Crimes] Act, the Act does not require that he be deprived of the protection afforded by an instruction on a lesser included offense, assuming of course that the evidence warrants such an instruction." 412 U.S. at 214. Citing Federal Rule of Criminal Procedure 31(c) and its own decisions reviewing convictions of federal

defendants, the *Keeble* Court reasoned, "Although the lesser included offense doctrine developed at common law to assist the prosecution in cases where the evidence failed to establish some element of the offense originally charged, it is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble*, 412 U.S. at 208 (footnotes omitted). The *Mathews* Court stated, "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor," and cited *Keeble* for the proposition that "[a] parallel rule has been applied in the context of a lesser included offense instruction." 485 U.S. at 63. The *Mathews* Court ultimately held "that even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." 485 U.S. at 62. Significantly though, both *Keeble* and *Mathews* reached the Supreme Court through the direct review process. And neither case clearly establishes a constitutional rule that would apply in the habeas context. *See Winston v. Kelley*, 624 F. Supp. 2d 478, 507-08 (W.D. Va. 2008) (discussing *Keeble* and *Beck v. Alabama*, 447 U.S. 625 (1980), and concluding that "[t]he Supreme Court has never indicated that *Keeble* embodies a constitutional principle that is applicable to the states. Therefore, it is not a source of clearly established federal law for purposes of federal habeas review"), *vacated in part on other grounds*, 592 F.3d 535 (4th Cir. 2010); *Jackson v. Mullin*, 46 F. App'x 605, 609 (10th Cir. 2002) (stating that *Mathews* "held '[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor,'" but reasoning that holding did not control in a federal habeas case because the *Mathews* decision "was not based on the Constitution or federal habeas corpus principles. Rather, it was

35

based on federal common law and rules and the Supreme Court's supervisory power over direct appeals").[19]  Based on the foregoing, § 2254(d)(1) bars relief.

Second, Robinson contends the OCCA's decision is based on an unreasonable determination of the facts because the OCCA found that he "proclaimed his innocence" at trial and presented an alibi defense but the record shows that he did not testify at trial and that the jury was not given an alibi instruction.  Dkt. 3, at 25.  To be sure, Robinson did not testify at trial and proclaim his own innocence at trial.  But Robinson did present evidence at trial to support his claim that he did not burglarize the Whites' house because, according to his witnesses, he was at home all day installing a window air conditioning unit when the Whites' house was burglarized.  Dkt. 29-4, generally.  Thus, it was not factually unreasonable for the OCCA to determine that Robinson "proclaimed his innocence" by presenting an alibi defense even though he did not testify.  *See, e.g.*, *Campbell v. State*, 640 P.2d 1364, 1366 (Okla. Crim. App. 1982) (rejecting appellant's claim that trial court erred in denying requested instruction on the lesser included offense of breaking and entering and reasoning, "This Court has long held that an instruction on a lesser included offense need only be given when there is evidence that tends to prove the lesser included offense

---

[19] More recently, the Tenth Circuit seemingly suggested that *Mathews* may apply in the habeas context.  *See Powell v. Farris*, No. 22-6067, 2023 WL 1872578, at *3-4 (10th Cir. Feb. 10, 2023) (unpublished) (citing *Mathews* for the proposition that "[a] defendant is entitled to an instruction on his theory of the case if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant," and concluding that "[t]he OCCA did not unreasonably apply federal law by concluding that [a federal habeas petitioner] was not entitled to have the jury instructed on his defense theory").  If the *Mathews* decision does not control in a federal habeas case, as the Tenth Circuit reasoned in *Jackson*, it is unclear why the Tenth Circuit identified *Mathews* as clearly established federal law in *Powell*.  In any event, even assuming *Mathews* has some application in a federal habeas case, the issue in *Mathews* was the denial of a requested instruction on a theory of defense.  485 U.S. at 62.  Here, the issue is the omission of a lesser included offense instruction, and *Dockins* and *Dewberry* are directly on point and preclude a grant of habeas relief as to claim three.

was committed.  In the case at bar, the appellant's defense, which was alibi, did not suggest any lesser included offenses." (internal citations omitted)).  Because the OCCA's decision is based on an objectively reasonable determination of the facts, § 2254(d)(2) also bars relief.

For these reasons, the Court denies the petition as to claim three.

### 4.  Claim four:  ineffective assistance of trial counsel

Next, Robinson claims trial counsel provided constitutionally ineffective assistance, in violation of his Sixth Amendment right to the effective assistance of counsel.  Dkt. 1, at 6.

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel.  U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  A defendant alleging counsel's representation was constitutionally inadequate must show deficient performance and resulting prejudice.  *Strickland*, 466 U.S. at 692.  The defendant can demonstrate deficient performance by showing that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  But the *Strickland* standard is "highly deferential" because a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Significantly, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id.* at 691.  Thus, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."  *Id.* at 692.  To establish *Strickland* prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  In determining whether a defendant has established *Strickland* prejudice, "the [reviewing] court should be concerned with whether, despite

the strong presumption of reliability, the result of the proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. And, while the *Strickland* inquiry has two components, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.

Robinson contends, much like he did on direct appeal, that trial counsel performed deficiently and prejudicially by (1) demonstrating "general ineptitude" during his examination of several state witnesses, (2) failing "to object to the trial court's investigation and participation in the impeachment of Tammie Chidester" and failing to investigate "the testimony of the other witnesses in order to flesh out the inconsistencies" in their testimony, and (3) failing to request jury instructions on the defense of alibi and the lesser included offense of breaking and entering without permission. Dkt. 3, at 26-32.[20]

Applying *Strickland*, the OCCA rejected Robinson's claim. The OCCA stated:

> [Robinson] does not show deficient performance and prejudice with any of his ineffective assistance of counsel claims. Only [his] challenge to trial counsel's handling of Tammie Chidester's testimony requires extended discussion. As discussed above in connection to Proposition II, the trial court did not abuse its discretion with the inquiry of Chidester, advising her of the jail records in light of her palpable perjury. Assuming *arguendo* deficient performance from defense counsel's investigation (or non-investigation) of Chidester's jail records, [Robinson] fails to show *Strickland* prejudice. Notably, [Robinson] does not argue that trial counsel was ineffective for presenting Chidester as a witness. It is therefore entirely unclear how [Robinson] could ever show *Strickland* prejudice

---

[20] Harvanek contends Robinson "expanded" claim four by including arguments he did not present on direct appeal. Dkt. 28, at 52-54. Because Robinson appears without counsel, the Court liberally construes his filings. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). In some instances, Robinson has changed the wording of arguments that he presented in state court. But the Court does not read claim four as asserting an expanded claim. Rather, the only substantial change is that Robinson no longer alleges trial counsel was ineffective for failing to object to an erroneous instruction regarding the fine the jury could impose. *Compare* Dkt. 3, at 26-36 *with* Dkt. 28-2, at 48-58.

based on counsel's failure to discover the jail records prior to trial as [Robinson] does not suggest how trial counsel could have "drawn the sting" of the jail records.

Moreover, even if trial counsel's performance was deficient for presenting Chidester's testimony, [Robinson] fails to show *Strickland* prejudice in light of the victim's unequivocal identification testimony along with the dubious alibi testimony from [Robinson's] four family members. Simply, this is not a case where Tammie Chidester's discredited testimony undermined an otherwise viable alibi defense. Rather, the alibi testimony from [Robinson's] relatives was largely discredited before Chidester ever took the stand. The family members [Robinson] presented to establish an alibi were inherently biased—a fact the prosecutor highlighted on cross-examination (Tr. II 14-15, 24, 33-34, 49)—and their collective testimony was inconsistent on material issues like whether [Robinson] responded to the disturbance in his grandmother's backyard and whether money was tight for [Robinson] at the time of the burglary (Tr. II 9-12, 16, 36-37, 45). [Robinson's] family members all agreed that he was approximately a block and a half (a short walk) away from the victim's house when the burglary occurred. Thus, even crediting the defense testimony that [Robinson] was assisting with the air conditioner installation the day of [the] burglary, he had more than sufficient opportunity to commit the crime considering the close proximity of the victim's house to his location.

Notable too was the incredible testimony of the family members that [Robinson] could not have left their sight even for ten minutes the day of the burglary. Eddie Bridges's attempt to bolster this testimony with his claim that he was unaware of [Robinson] ever shutting the door when [Robinson] used the bathroom served to cast suspicion on the testimony of [Robinson's] family members. The failure of [Robinson's] mother, Tammy Bridges, to bring the receipt for the air conditioner, which she testified was in the possession of her mother-in-law is of the same ilk. The receipt would have bolstered her contention that the air conditioner was installed on the date of the victim's burglary. Despite the receipt being brought up by the prosecutor during Mrs. Bridges's preliminary hearing testimony, she still failed to bring it to court (Tr. II 27-28). The totality of the family members' testimony allowed the jury to infer that their testimony was manufactured to help [Robinson] beat the burglary charge.

All things considered, [Robinson] fails to show that trial counsel was ineffective.

Dkt. 28-1, at 8-11 (footnotes omitted).

Robinson contends the OCCA unreasonably applied *Strickland* because it "denied this claim based completely on the circumstances surrounding counsel's deficient performance in not investigating [Ms.] Chidester's jail records" and "largely ignore[ed] the remainder of this claim."

39

Dkt. 3, at 26. He further contends the OCCA unreasonably applied *Strickland*'s prejudice prong, arguing, "[h]ad counsel acted reasonably, the jury would not have heard information regarding [Robinson's] prior convictions, would not have heard conflicting testimony concerning the defense of alibi, would not have heard Chidester's impeachment, and would have gotten an instruction for either alibi or lesser-included offense." *Id.* at 32. Harvanek contends the OCCA reasonably applied *Strickland* when it rejected Robinson's claim. Dkt. 28, at 43-55.

On federal habeas review, a court must apply added deference when reviewing a state court's decision on a *Strickland* claim. *See Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) ("We have recognized the special importance of the AEDPA framework in cases involving *Strickland* claims."). This means that a federal habeas court should not grant a writ of habeas corpus on a *Strickland* claim if, among fairminded jurists, there is "ample room for reasonable disagreement about the prisoner's ineffective-assistance-of-counsel claim." *Id.*; *see also Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal citations omitted)). Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. And, as to those portions of Robinson's claim that the OCCA did not explicitly address in its decision, this Court "must determine what arguments or theories . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of [the Supreme Court]." *Richter*, 562 U.S. at 102.

Applying these principles, the Court first considers whether there are reasonable arguments to support the OCCA's decision that trial counsel did not perform deficiently or prejudicially as to

the allegations of ineffectiveness the OCCA did not expressly discuss. The Court then considers the reasonableness of the OCCA's decision that even if trial counsel performed deficiently as to his investigation and presentation of Ms. Chidester's testimony, Robinson did not establish *Strickland* prejudice.

### a. Allegations of ineffectiveness not discussed by OCCA

### i. General ineptitude

Robinson alleges trial counsel demonstrated "general ineptitude" when cross examining the State's witnesses. Dkt. 3, at 26. Specifically, he alleges:

> (1) the trial court twice admonished counsel for trying to impeach Ms. White with prior testimony in an improper fashion and admonished counsel for attempting to have Officer Diedrich read to the jury hearsay statements from his police report; during cross-examination of Diedrich;
>
> (2) trial counsel improperly attempted to question Officer Diedrich about information from a police report he did not author; and
>
> (3) trial counsel nearly violated the terms of a motion in limine the trial court granted in Robinson's favor before trial by asking Detective Mellen questions about photographs of Robinson when the answers would have revealed that the photos were taken when Robinson previously was incarcerated in the Washington County Jail.

Dkt. 3, at 26-27. As to this third point, Robinson acknowledges that the prosecutor's timely objection prevented Detective Mellen from testifying that Robinson's photograph was taken during his previous incarceration. Dkt. 3, at 27. But Robinson notes that information about his prior criminal history was later presented to the jury "by witnesses for the defense" thereby demonstrating that "counsel clearly had not directed [those witnesses] to avoid mention of [his] prior criminal history and incarceration." *Id.* Robinson contends counsel's deficiencies as to examining State witnesses and failing to adequately prepare defense witnesses prejudiced him by placing prejudicial information about his prior criminal history before the jury. *Id.*

As Robinson contends, counsel's cross-examination of the State's witnesses was not flawless. But the Sixth Amendment demands only reasonably effective counsel, not "perfect counsel." *Burt v. Titlow*, 571 U.S. 12, 24 (2013); *see also Strickland*, 466 U.S. at 689 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."). And there is a reasonable argument to support the OCCA's determination that trial counsel did not perform deficiently or prejudicially as to his cross-examination of Ms. White. For example, trial counsel challenged the reliability of Ms. White's identification of Robinson by eliciting testimony from Ms. White about her initial description of Robinson as black or "half black," eliciting testimony from Ms. Grayson about Robinson's race (white) and his multiple tattoos, and emphasizing during closing argument that Ms. White not only misidentified Robinson's race but also failed to mention in any of her descriptions Robinson's tattoos that would have been visible if he was wearing a sleeveless shirt. Dkt. 29-3, Tr. Trial vol. 1, at 211-20; Dkt. 29-4, Tr. Trial vol. 2, at 85-87.

That said, the Court struggles to discern a reasonable argument to support the OCCA's view that trial counsel did not perform deficiently as to his cross-examination of Officer Diedrich and Detective Mellen or as to his apparent failure to adequately advise defense witnesses to avoid mentioning Robinson's prior incarceration. Highly summarized, Officer Diedrich testified on direct examination that he responded to a call from dispatch reporting the burglary at the Whites' house, that he briefly searched near the cemetery for a person fitting the description provided to him by the dispatcher, and that he observed damage to the back door when he spoke with Ms. White. Dkt. 29-3, at 226-29. Trial counsel's cross-examination of Officer Diedrich, however, shows that trial counsel was confused about Diedrich's role in the criminal investigation and that counsel may not have understood which, if any, police reports Diedrich created regarding the

42

burglary. *Id.* at 229-35. And, as Robinson contends, it was only the prosecutor's timely objection that prevented trial counsel from violating his own motion in limine by eliciting testimony from Detective Mellen that would have revealed evidence of Robinson's prior incarceration. The following portion of the transcript, that the OCCA found unnecessary to expressly consider, illustrates this point:

Q    (By Mr. Conatser)  Mr. Mellen, let me show you what has been previously marked Exhibit 1.  Do you see that?

A    Yes.

Q    You've seen that?

A    Yes.

Q    Now, let me show you what's been marked Exhibit 5.

A    Okay.

Q    Did you show that to Ms. White?

A    No.

Q    Did you take that picture?

A    No.

Q    Who took these pictures?

MR. DRAKE:  Objection, Judge.  We need to approach.

THE COURT:  Sustained.  Just ask him - - that's not relevant about who took the pictures.  Ask another question.

MR. CONATSER:  Well, I'd like to ask him about one of the pictures.

THE COURT:  You can ask him.

Q    (By Mr. Conatser)  All right.  With that in mind then let me show you this picture then, officer.  The picture of the sixth person there.

A    Uh-huh.

Q    Where was that picture taken?

43

> MR. DRAKE:  Um, Judge - -
>
> THE COURT:  Approach, please.  Ladies and gentlemen of the jury, please go to the jury room and we'll get you in just a moment.

Dkt. 29-3, at 242-43.  After the jury was excused, the prosecutor explained that all photos used in the two exhibits depicting the six-person photo lineup were "taken either at the Washington County Jail or the Bartlesville Police Department" and stated that it was Mr. Conatser's choice if he wanted that information in evidence but argued that introducing that evidence could cause a mistrial.  Dkt. 29-3, at 243-44.  The trial court agreed, stating:

> That elicits an evidentiary harpoon in this case.  In other words, these jurors are not to know that Mr. Robinson has ever been arrested prior to this event.  So obviously if you go into those questions you're going to allow them to know he has been arrested before on prior arrests.  Do you understand that?  That's where we're at at this point in time.  That's why it's improper to ask him about this because the answer is he got all these pictures out of the records of the sheriff's office.  So that's why it's not relevant.  One, it's not relevant to them and they're not suppose to know that he has prior felonies and consider that in his deal.
>
> So I'm not sure why you're asking - - what's your purpose of asking where these were taken at?

Dkt. 29-3, at 244.  Trial counsel explained that "the purpose is the picture is not indicative of what the defendant looks like."  *Id.*  The trial court then advised that counsel should find a different way to ask the question that avoids eliciting testimony that would "alert this jury that [Robinson] has been arrested before and probably cause a mistrial in this case."  *Id.* at 244-45.  Thereafter, the jury returned to the courtroom and trial counsel asked whether the photo of Robinson depicted in State's Exhibit 1 was "indicative of what Mr. Robinson looks like."  *Id.* at 246.  Detective Mellen said, "Yes."  *Id.*  Trial counsel then stated, "Look at the picture and tell me if that's the same man over

there." *Id.* Detective Mellen said, "Yes." *Id.*[21] After eliciting this testimony that arguably bolstered Ms. White's in-court and out-of-court identifications of Robinson, trial counsel's only other question of Detective Mellen elicited testimony that Detective Mellen neither arrested Robinson nor completed an arrest report. *Id.* at 246-47. On this record, the Court finds no reasonable argument to support the OCCA's assessment that trial counsel's performance as to the cross-examination of Officer Diedrich and Detective Mellen satisfied *Strickland*'s deferential standard of reasonableness under the circumstances.

Moreover, trial counsel's apparent obliviousness to the damaging nature of the testimony he nearly elicited from Detective Mellen tends to support Robinson's related allegation that trial counsel failed to adequately caution Robinson's own witnesses to avoid telling the jury about Robinson's prior incarceration. As previously discussed, both Robinson's mother and his fiancée referred to the fact that Robinson previously had been in jail, prison, and a halfway house. Dkt. 29-4, at 26-27, 48. Thus, while Harvanek aptly describes the testimony from both witnesses as "partially, or fully, non-responsive answers to the attorneys' questions," the Court cannot agree with Harvanek's assertion that "the record is silent as to whether trial counsel failed to advise the

---

[21] Harvanek describes trial counsel's initial questions of Detective Mellen as "inartfully phrased" and suggests trial counsel "clearly had a reasonable strategy of attempting to demonstrate that [Robinson] looked much different in court than in the photo used for Ms. White's identification in order to highlight the possibility of misidentification." Dkt. 28, at 47. But Harvanek's generous assessment of counsel's performance stands in stark contrast to the trial court's contemporaneous statements that strongly suggest trial counsel did not understand why his questions to Detective Mellen were inappropriate. *See* Dkt. 29-3, at 244 ("So obviously if you go into those questions you're going to allow them to know he has been arrested before on prior arrests. Do you understand that?"); *see Strickland*, 466 U.S. at 690 ("a court deciding an ineffective assistance claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). Even assuming counsel had a reasonable strategy of highlighting the possibility of misidentification, no reasonably competent criminal defense attorney would have asked a law enforcement officer how the officer obtained the defendant's mugshot that was used in a photo lineup.

witnesses to avoid mention of [Robinson's] criminal history and prior incarcerations." Dkt. 28, at 48-49. Instead, the trial transcript, viewed in its entirety, supports Robinson's view that trial counsel performed deficiently by not adequately preparing defense witnesses on this point.

### ii.     Failure to request jury instructions

Robinson also alleges trial counsel performed deficiently and prejudicially by failing to request a jury instruction on the defense of alibi and a jury instruction on the lesser included offense of breaking and entering without permission. Dkt. 3, at 29-32. Robinson contends counsel had a duty to request the alibi instruction "[b]ecause *prima facie* evidence of an alibi defense had been presented through witness testimony," that reasonably competent counsel would have also requested a lesser included offense instruction on misdemeanor breaking and entering without permission because the alibi "defense was greatly weakened by lack of credibility and through impeachment of [Ms.] Chidester" and evidence of intent was "deficient," and that counsel's failure to request these instructions resulted in prejudice because a properly instructed jury likely would have found Robinson guilty of misdemeanor breaking and entering without permission even if it disregarded the testimony of his alibi witnesses. *Id.*

As to these failures, there are reasonable arguments to support the OCCA's decision that trial counsel did not perform deficiently or prejudicially. First, as to the instruction on the alibi defense, the OCCA had previously determined that Robinson was not entitled to an instruction on the alibi defense under the facts of the case. Dkt. 28-1, at 6. Under Oklahoma law, a trial court should give an alibi instruction only if the evidence "show[s] that, at the very time of the commission of the crime charged, the accused was at another place so far away or under such circumstances that he could not, with ordinary exertion, have reached the place where the crime was committed so as to have participated in the commission thereof." *Goodwin v. State*, 654 P.2d

643, 644 (Okla. Crim. App. 1982). And, when, as here, the defendant does not request the instruction, the OCCA will review its omission only for plain error. *Honeycutt v. State*, 834 P.2d 993, 999. As the OCCA reasoned, the evidence presented at trial showed that Robinson "was a short walk from the victim's residence at the time of the burglary." Dkt. 28-1, at 6. Even assuming trial counsel should have requested an alibi instruction, the trial court necessarily would have rejected that request because Robinson was not entitled to that instruction under state law. *See Bland*, 459 F.3d at 1031 ("Counsel therefore could not have been ineffective in failing to request an instruction to which [the defendant] was not entitled based on the evidence . . ..").

Second, and likewise, it was reasonable for the OCCA to determine that counsel's failure to request a lesser included offense instruction was not ineffective because, under state law, Robinson was not entitled to that instruction. *See Darks v. Mullin*, 327 F.3d 1001, 1008 (10th Cir. 2003) ("[T]he availability of a lesser included offense instruction in a state criminal trial is a matter of state law."). "Under Oklahoma law, '[a] trial court must instruct the jury on lesser-included offenses when the lesser-included offense or the defendant's theory of the case is supported by any evidence in the record.'" *Simpson v. Carpenter*, 912 F.3d 542, 596-97 (10th Cir. 2018) (quoting *Hooker v. State*, 887 P.2d 1351, 1361 (Okla. Crim. App. 1994)). But, as previously discussed, the OCCA determined that state law precluded a lesser included offense instruction in Robinson's case because Robinson "proclaimed his innocence in defending this case by presenting an alibi defense at the jury trial." Dkt. 28-1, at 7; *see Harney*, 256 P.3d at 1005-06 (noting that the OCCA "has long recognized the rule of law that a defendant is not entitled to instructions on any lesser included offense when he defends against the charge by proclaiming his innocence."); *Campbell*, 640 P.2d at 1366 (rejecting appellant's claim that trial court erred in denying requested instruction on the lesser included offense of breaking and entering and reasoning that the OCCA "has long held that

an instruction on a lesser included offense need only be given when there is evidence that tends to prove the lesser included offense was committed.  In the case at bar, the appellant's defense, which was alibi, did not suggest any lesser included offenses." (internal citations omitted.)).  Because state law precluded a lesser included offense instruction, trial counsel could not have been ineffective for failing to request it.  *Bland*, 459 F.3d at 1031.

### iii.     Conclusion

In sum, the foregoing shows that it may have been objectively unreasonable for the OCCA to determine that trial counsel provided reasonably competent performance as to his cross-examination of two state witnesses and as to his presentation of defense witnesses who were apparently not advised to avoid mention of Robinson's prior incarceration.  However, as discussed next, even assuming the OCCA should have found these additional deficiencies, this Court cannot say that the OCCA's analysis of *Strickland* prejudice would have been any different or that the OCCA's decision as to *Strickland* prejudice is objectively unreasonable.

### b.     Allegations of ineffectiveness discussed by OCCA

Robinson alleges trial counsel performed deficiently and prejudicially by failing to object to the trial court's investigation and participation in the impeachment of Ms. Chidester, by failing to conduct his own investigation of Ms. Chidester before trial, and by making an uninformed decision to present Ms. Chidester's testimony at trial.  Dkt. 3, at 27-28; *see Strickland*, 466 U.S. at 690 (noting counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

The OCCA scrutinized trial counsel's performance more closely as to these alleged deficiencies.  But for two reasons, Robinson has not shown that the OCCA's decision is objectively unreasonable.  First, to the extent Robinson faults trial counsel for failing to object to the trial

court's allegedly improper participation in the impeachment of Ms. Chidester, the Court finds the OCCA's decision is objectively reasonable for the same reason Robinson is not entitled to habeas relief as to claim two. *See supra* section III.C.2. Simply stated, because it was objectively reasonable for the OCCA to conclude that the trial court's intervention did not violate Robinson's right to due process or otherwise deprive him of a fair trial, it was objectively reasonable for the OCCA to conclude that trial counsel did not perform deficiently or prejudicially by failing to object to the trial court's actions.

Second, to the extent Robinson alleges trial counsel failed to investigate Ms. Chidester's anticipated testimony and made an uninformed decision to present her testimony at trial, the Court finds it was objectively reasonable for the OCCA to assume without deciding that trial counsel performed deficiently in both respects. Dkt. 28-1, at 8-9.[22] Ultimately though, the OCCA determined that counsel's assumed deficiencies regarding the investigation and presentation of Ms. Chidester's testimony did not prejudice Robinson. In reaching that determination, the OCCA reasoned that the testimony from Robinson's alibi witnesses was inconsistent, "incredible,"

---

[22] Arguably, the record would have supported an explicit finding on that counsel performed deficiently regarding his investigation and presentation of Ms. Chidester's testimony. As previously discussed, the chambers discussion about Ms. Chidester's jail records strongly suggests that neither attorney was aware, before trial, that Ms. Chidester was detained at the Washington County Jail on the date and at the time she allegedly witnessed Mr. Fouts running near the White Rose Cemetery. Dkt. 29-4, at 56-58. And trial counsel effectively admitted he did not adequately investigate Ms. Chidester's anticipated testimony when he stated, "All I had was a letter from her." *Id.* at 57. And, even fairly read, trial counsel's direct examination questions also suggest his investigation of Ms. Chidester most likely occurred at trial rather than before trial. *Id.* at 51-56. Other portions of the record show that trial counsel obtained Ms. Chidester's letter, at the very latest, by December 2013—one month before trial—when he filed a disclosure notice describing her anticipated testimony. With this much time to investigate the credibility of Ms. Chidester's anticipated testimony, it was more than reasonable for the OCCA to assume that trial counsel performed deficiently as to his pretrial investigation of Ms. Chidester and his uninformed decision to present her testimony at trial.

"inherently biased," and "largely discredited before Chidester ever took the stand." Dkt. 28-1, at 9-10. The OCCA further reasoned that "even crediting the defense testimony that [Robinson] was assisting with the air conditioner installation the day of [the] burglary, he had more than sufficient opportunity to commit the crime considering the close proximity of the victim's house to his location." *Id.* Finally, the OCCA reasoned that Ms. White's identification testimony was "unequivocal" and that her testimony about Robinson standing in the laundry room for several seconds and appearing not to understand what she was saying was significantly corroborated by Detective Mellen's testimony that Robinson has a hearing impairment. *Id.* at 9 & n.2. In other words, the OCCA viewed the record as a whole and found no reasonable probability that, but for counsel's alleged deficiencies, the result of his trial would have been different.

Even if all fairminded jurists might agree that it was objectively unreasonable for the OCCA not to find other aspects of trial counsel's performance deficient or to include those additional deficiencies in assessing *Strickland* prejudice, this Court concludes that it must deny the petition as to claim four because there is "room for reasonable disagreement" as to the OCCA's decision that Robinson was not denied his Sixth Amendment right to the effective assistance of trial counsel. *Kayer*, 141 S. Ct. 517. The Court thus denies the petition as to claim four.

**F.    Claim five:  ineffective assistance of appellate counsel**

In his fifth and final claim, Robinson contends appellate counsel provided constitutionally ineffective assistance, in violation of his Sixth Amendment right to the effective assistance of counsel. Dkt. 1, at 7; Dkt. 3, at 32-37.

The Sixth Amendment right to the effective assistance of counsel extends to a criminal defendant's first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). And *Strickland*'s deferential two-part test governs a reviewing court's evaluation of a criminal defendant's claim

that appellate counsel was constitutionally ineffective. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). "To prevail on a claim of ineffective assistance of appellate counsel, a defendant must establish that counsel was objectively unreasonable in failing to raise or properly present a claim on direct appeal, and that there is a reasonable probability that, but for this unreasonable failure, the claim would have resulted in relief on direct appeal." *Fairchild v. Trammell*, 784 F.3d 702, 715 (10th Cir. 2015). When applying *Strickland*'s two-part test to consider the adequacy of appellate counsel's representation, reviewing courts necessarily must "look to the merits of" the issue that was either not raised or, in the defendant's view, not adequately presented. *Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004) (quoting *Cargle*, 317 F.3d at 1202). If the underlying claim lacks merit, then a petitioner cannot show that appellate counsel performed deficiently by omitting it, much less that the omission resulted in prejudice. *Cargle*, 317 F.3d at 1202.

Robinson contends appellate counsel erroneously omitted two claims from his direct appeal: (1) an ineffective-assistance-of-trial-counsel claim premised on trial counsel's (a) failure to challenge the reliability of Ms. White's out-of-court identification of Robinson as the product of "witness tampering" by Detective Mellen and (b) failure to object to Detective Mellen's presence in the courtroom during Ms. White's testimony; and (2) a prosecutorial misconduct claim premised on the prosecutor's alleged complicity in (a) permitting Detective Mellen to tamper with Ms. White's out-of-court identification by showing her a photo lineup with names on it before she identified Robinson on a photo lineup without names and (b) permitting Detective Mellen to "perjure[] himself on the stand by testifying that he never showed Ms. White the [photo] lineup with names on it." Dkt. 1, at 7; Dkt. 3, at 32-36.

The Court concludes that claim five must be denied because both underlying claims lack merit.[23]  Both claims Robinson identifies as wrongly omitted from his appeal rest on Robinson's allegation that Detective Mellen impermissibly tampered with or tainted Ms. White's out-of-court identification of Robinson by showing Ms. White a six-person photo lineup with names under each photo *before* showing Ms. White the six-person photo lineup without names on which she circled and initialed Robinson's photo.  Dkt. 3, at 33-37.  But the record resoundingly refutes Robinson's view of the facts.

Ms. White testified at trial that Detective Mellen showed her a "series of pictures" on July 17, 2013, and Ms. White identified the six-person photo lineup without names (State's Exhibit 1) as the photo lineup presented to her by Detective Mellen.  Dkt. 29-3, at 203-05.  Detective Mellen testified at trial that he prepared two copies of a six-person photo lineup, one copy with names under each photo (State's Exhibit 5) and one copy without names (State's Exhibit 1).  *Id.* at 236-38, 242-43; Dkt. 29-5, at 1, 8.  Detective Mellen further testified that on July 17, 2013, he presented to Ms. White only the six-person photo lineup without names (State's Exhibit 1), and that White

---

[23] Harvanek contends that this Court should find claim five procedurally defaulted because Robinson did not present this claim to the OCCA through a properly perfected postconviction appeal.  Dkt. 28, at 55-63.  Harvanek acknowledges that this Court previously determined Robinson was not at fault for failing to perfect the postconviction appeal.  Dkt. 28, at 59; *see* Dkt. 22, at 24-25.  And the Court relies on its prior ruling to conclude that Robinson has shown cause for the procedural default of claim five.  *See Johnson v. Champion*, 288 F.3d 1215, 1227-28 (10th Cir. 2002) (finding cause to excuse a procedural default when state actors caused or significantly contributed to petitioner's failure to perfect a postconviction appeal).  But Harvanek argues that Robinson cannot establish actual prejudice to overcome the procedural default.  *See id.* at 1227 (noting that a petitioner attempting to overcome a procedural default "must demonstrate 'actual prejudice resulting from the alleged constitutional violation'" (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977))).  The Court finds it easier to deny relief on the merits because Robinson cannot establish deficient performance, much less establish *Strickland* prejudice or the more demanding actual prejudice standard.  *See Smith v. Duckworth*, 824 F.3d 1233, 1242 (10th Cir. 2016) (noting that "where 'the claim may be disposed of in a straightforward fashion on substantive grounds,' [a habeas court] retains discretion to bypass the procedural bar and reject the claim on the merits" (quoting *Revilla v. Gibson*, 283 F.3d 1203, 1210-11 (10th Cir. 2002))).

circled and initialed Robinson's photo.  Dkt. 29-3, at 237-39, 242.  No trial testimony supports Robinson's assertion that Detective Mellen tampered with Ms. White's out-of-court identification of Robinson or that Detective Mellen lied about his presentation of the photo lineup.  Similarly, Robinson's assertion that trial counsel should have objected to Detective Mellen's presence in the courtroom during Ms. White's testimony rests on his unfounded speculation that Mellen impermissibly conformed his testimony to Ms. White's testimony to cover up the allegedly tampered-with presentation of the photo lineup.  Moreover, any objection by trial counsel to Detective Mellen's presence in the courtroom would have been meritless because Oklahoma law exempts case agents from the rule of sequestration.  *Dyke v. State*, 716 P.2d 693, 698 (Okla. Crim. App. 1986).  On the record presented, Robinson cannot establish that appellate counsel performed deficiently, much less prejudicially, by omitting the claims Robinson identifies.  The Court therefore denies the petition as to claim five.

### CONCLUSION

Because it would be futile to permit Robinson to amend the petition, the Court denies his motion for leave to amend.  And because Robinson has not established that he is in state custody in violation of the Constitution or laws or treaties of the United States, the Court denies his petition for writ of habeas corpus under 28 U.S.C. § 2254(a).  However, because the Court finds that reasonable jurists might debate this Court's assessment of Robinson's ineffective-assistance-of-trial counsel claim, the Court grants Robinson a certificate of appealability as to one issue:  whether trial counsel violated his Sixth Amendment right to the effective assistance of counsel as alleged in claim four.  *See* 28 U.S.C. § 2253(c)(2) (providing that a district court may issue a certificate of appealability "only if the [petitioner] has made a substantial showing of the denial of a constitutional right"); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) ("A petitioner satisfies this

standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."). The Court declines to issue a certificate of appealability as to all other claims asserted in the petition, as to all claims Robinson sought leave to add to his petition through his motion for leave to amend, and as to the procedural ruling denying the motion to amend.

   **ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Motion to Amend the Application for Habeas Relief (Dkt. 36) is **denied**.

2. The Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Dkt. 1) is **denied**.

3. A certificate of appealability is **granted** as to one issue: whether trial counsel provided constitutionally ineffective assistance, in violation of Robinson's Sixth Amendment right to the effective assistance of counsel, as alleged in claim four.

4. A certificate of appealability is **denied** as to all other claims asserted in the petition, as to all claims Robinson sought leave to add to his petition through his motion for leave to amend, and as to the procedural ruling denying the motion to amend.

5. A separate judgment shall be entered in this matter.

   **DATED** this 17th day of March, 2023.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

54

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KEITH EARL ROBINSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )    Case No. 20-CV-0086-GKF-CDL |
| | ) |
| KAMERON HARVANEK, | ) |
| | ) |
| Respondent. | ) |

## <u>JUDGMENT</u>

This matter came before the Court on Petitioner Keith Earl Robinson's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition") (Dkt. 1). In an Opinion and Order filed contemporaneously herewith, the Court denied the Petition.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that judgment is hereby entered in favor of Respondent and against Petitioner.

**DATED** this 17th day of March, 2023.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

UNITED STATES DISTRICT COURT
For the
NORTHERN DISTRICT OF OKLAHOMA

**FILED**

APR 03 2023

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

KEITH EARL ROBINSON,
          Plaintiff(s),

v.

KAMERON HARVANEK,
          Defendant(s)

Case No. 20-CV-0086-GKF-CDL

**NOTICE OF APPEAL**

The Plaintiff, Keith Earl Robinson, gives notice of intent to appeal to the United States Court of Appeals for the 10th Circuit from the order denying petitioner's application for Habeas Corpus relief entered in the Northern District Court of Oklahoma on the 17th of March.

Respectfully submitted on this 30th day of March, 2023.

/s/ _____
Keith Earl Robinson #479285
L.C.C. Unit 5-H-1-A
P.O. Box 260
Lexington, OK 73051

✓ Mail ___ No Cert Svc ___ No Orig Sign
___ C/J ___ C/MJ ___ C/Ret'd ✓ No Env
___ No Cpys ___ No Env/Cpys ___ O/J ___ O/MJ

Forms

**UNITED STATES DISTRICT COURT**
**For the**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| Keith Earl Robinson | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-CV-0086-GKF-CDL |
| | ) | |
| | ) | |
| Kameron Harvanek | ) | |
| Defendant | ) | |

**DECLARATION OF INMATE FILING**

I am an inmate confined in an institution. Today, 30 March, 2023, I am depositing the Notice of Appeal in this case in the institution's internal mailing system. First-class postage is being prepaid either by me or by the institution on my behalf.

I declare under penalty of perjury that the foregoing is true and correct (see 28 U.S.C. § 1746; 18 U.S.C. § 1621).


/s/ _Keith Robinson_
Keith Earl Robinson #479285
L.C.C. Unit 5-H-1-A
P.O. Box 260
Lexington, OK 73051


Signed on 30th March, 2023

US POSTAGE PITNEY BOWES

ZIP 73051 $ 001.50°
02 4W
0000380205 MAR 30 2023

Postmarked
3|30|23
MB

20-CV-86-GKF-CDL

RECEIVED

APR 03 2023

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

U.S. District Court Clerk
333 W. 4th St., #411
Tulsa, OK    74103

Robinson, Keith #479285
LCC Unit 5-H1-A
P.O. Box 260
Lexington, OK 73051

LEGAL MAIL



This correspondence is from an offender under the custody
of the Oklahoma Department of Corrections (ODOC).
For specific information about the offender sending
this correspondence such as offense, projected release date,
photo, etc., refer to our website at www.ok.gov/doc.
Click on the "Offender Information" link then the
"Offender Lookup" link or contact (list facility contact and
facility telephone number) at the facility telephone. Further, the
facility is not responsible for the substance or content.
Objectionable material may be returned to the facility head at:
Lexington A & R Center, P.O. Box 260
Lexington, OK 73051-0260